L. W. BROOKS, JR., AND JANE R. BROOKS, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1957–65, 1958–65, Filed September 26, 1968.
1879–66, 1880–66.

*J. W. Bullion* and *Buford P. Berry*, for the petitioners.
*D. Ronald Morello* for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the petitioners' income tax as follows:

|  | 1961 | 1962 |
|---|---|---|
| L. W. Brooks and Jane R. Brooks | $9, 019. 67 | $10, 134. 89 |
| W. J. Rhodes and Ellie T. Rhodes | 10, 082. 36 | 7, 717. 60 |

The issue in this case concerns the tax treatment of the operating expenses of a purchaser of a working interest in oil and gas property when such expenses exceed his share of the production while a production payment reserved by the seller is outstanding—are such excess expenses deductible, or must they be capitalized? If they must be capitalized, then other questions must be considered concerning how they are to be capitalized, and in what amount.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners L. W. Brooks, Jr., and Jane R. Brooks are husband and wife. They resided at Breckenridge, Tex., at the time the petitions were filed in this case. They filed joint Federal income tax returns for

---

[1] Cases of the following petitioners are consolidated herewith: L. W. Brooks, Jr., and Jane R. Brooks, docket Nos. 1957–65 and 1880–66; and W. J. Rhodes and Ellie T. Rhodes, docket Nos. 1958–65 and 1879–66.

the taxable years ended December 31, 1961, and December 31, 1962, using the cash method of accounting, with the district director of internal revenue, Dallas, Tex.

The petitioners W. J. Rhodes and Ellie T. Rhodes are husband and wife. They resided at Breckenridge, Tex., at the time the petitions were filed in this case. They filed joint Federal income tax returns for the taxable years ending December 31, 1961, and December 31, 1962, using the cash method of accounting, with the district director of internal revenue, Dallas, Tex.

Mr. Brooks and Mr. Rhodes, who will be referred to as the petitioners, are each independent oil and gas operators. Mr. Rhodes is Mr. Brooks' father-in-law. In an ABC transaction,[2] which was closed on March 12, 1960, the petitioners each acquired an undivided one-eighth interest in certain oil and gas leases located in Baylor County, Tex. (the Baylor properties).

The petitioners and their coowners purchased all of the working interest in the Baylor properties for a cash consideration of $475,000. Of this amount, $387,000 was properly allocable to physical equipment in and on the leases, and $88,000 was properly allocable to leasehold cost. In the assignment to the petitioners and their coowners, the seller reserved a production payment in the primary sum of $500,000, free and clear of all expenses.[3] This payment was dischargeable out of 85 percent of the net production. The term "net production" means the total production of the working interest less any landowners' royalties or any overriding royalties. The production payment was then transferred by the seller to a third party. By the terms of the assignment, the petitioners covenanted to develop the leases and continuously operate them or cause them to be operated in a good and workmanlike manner, and also agreed to deliver all production

---

[2] In a typical ABC transaction, A, the owner of producing oil and gas leases, sells to B the working interest in such leases for a cash consideration and retains a production payment in a specified dollar amount together with an amount equal to interest on the unliquidated principal balance of the payment. A production payment "is a right to oil and gas in place that entitles its owner to a specified fraction of production for a limited time, or until a specified sum of money (which may be determined by a formula) or a specified number of units of oil or gas has been received." Breeding & Burton, Income Taxation of Oil and Gas Production, par. 2.07 (1961). Simultaneously, A sells the retained production payment for a purchase price equal to its principal amount to C, an investor, who finances the purchase by a loan from a lending institution secured by a deed of trust and mortgage on the production payment and an assignment of the income accruing to the production payment.

[3] The usual and customary oil and gas lease and the usual and customary assignment of an oil and gas lease, including the leases and assignments herein, impose on the operator or owner of the working interest the obligation of delivering free of all cost whatsoever to a pipeline or other connection with the wellhead all production accruing to royalty interests such as landowners' royalties, overriding royalties, and production payments. In connection with lifting his share of production, an oil and gas operator or owner of the working interest lifts the production accruing to such royalty interests. Due to the nature of oil and gas and of such interests, an operator cannot lift his share of the production without lifting at the same time the share belonging to the royalty owners.

accruing to the reserved production payment to the pipeline with which the wells on the property were connected free and clear of all cost and expense whatsoever. In accordance with the provisions of such assignment and the underlying leases, each petitioner paid his prorata share of the costs of operating the Baylor properties.

In connection with the purchase of the Baylor properties, two projections of production were made. One study was made by Core Laboratories, Inc., an independent petroleum consulting firm specializing in waterflood techniques. One reason for its study was that the purchasers contemplated that the properties would be unitized, and accordingly, they had to secure an independent study of the participation factors to be proposed for the unitized properties. In addition, Core was asked its opinion on the feasibility of installing a "waterflood"—a system whereby water is injected into certain wells on a property with the goal of forcing the oil in place into other wells for extraction. According to the Core report, it was estimated that, with the waterflood installed, the total recoverable reserves could be recovered in 5 years. If the oil had been recovered at that rate, the production payment would have been satisfied in the first year of operation, and the share of production accruing to the operators would have been sufficient, during that year, to cover estimated direct expenses, overhead expenses, and depreciation of lease equipment. However, in this prediction, the estimated expenses did not include the cost of installing the waterflood.

The other projection was made by W. W. Walton, who was one of the purchasers, and who was a petroleum engineer with successful experience both in oil and gas consulting and in drilling and production. His estimate was more conservative, and predicted that it would require 8 years to recover the total reserves considered recoverable by Core. According to his estimate, the production payment would be paid out in the second year; the income accruing to the working interest during the first year would not be sufficient to cover direct expenses and overhead; but such income during the second year would be sufficient to cover the direct expenses and overhead, but not depreciation.

After the purchase of the Baylor properties, they were unitized into two separate units. Each unit constituted a "property" within the meaning of section 614 of the Internal Revenue Code of 1954.[4] The waterflood was installed at an approximate cost of $200,000, and was fully operative prior to the end of 1960. Neither oil produced nor operating expenses met the projections by Mr. Walton and Core. The production did not meet the projections because there was unanticipated free gas in the reservoir. The floodwater invaded these gas zones,

---

[4] All statutory references are to the Internal Revenue Code of 1954.

and therefore oil, especially from peripheral wells, was not moved as fast as expected. The operating expenses also exceeded the amount estimated. The wells used engines normally run by natural gas, which is produced with the oil. However, when the floodwater invaded the gas zones, gas was no longer produced, and electricity had to be supplied to run the engines. The cost of this electricity was substantial.

In an ACB transaction [5] which was closed on or about November 13, 1961, the petitioners each acquired an undivided one-fourth interest in 11 oil and gas leases located in Stephens County, Tex. (the Gulf properties). Each lease constituted a "property" within the meaning of section 614. The petitioners and their coowners purchased all the working interest in such properties for a cash consideration of $107,-000, of which $98,250 was properly allocated to physical equipment in and on the properties and $8,750 was properly allocated to lease-hold cost. In the assignment to the petitioners and their copurchasers, the seller reserved a production payment in the primary amount of $402,500, plus an amount equal to 7-percent interest on the unpaid balance. This payment was dischargeable out of 85 percent of the net production. As with the Baylor properties, there were outstanding landowners' royalties on the Gulf properties equal to one-eighth of gross production. The petitioners and their coowners covenanted to cause the properties to be operated in a good and workmanlike manner, and agreed to deliver the production accruing to the reserved production payment to the pipeline with which the wells on the property were connected free and clear of all cost or expense whatsoever. In accordance with the provisions of such assignment and the underlying leases, each petitioner paid his prorata share of the costs of operating the Gulf properties.

The wells on the Gulf properties produced only a small volume of oil, and production from them had been level for a number of years. The petitioners were experienced in operating this type of well, and as independent operators, they felt that they could operate such properties more cheaply than could a major company, like Gulf Oil Corp., which had previously operated the Gulf properties.

In connection with the acquisition of these properties, the petitioner Mr. Brooks prepared an estimate of income and expense for the properties, based on the income and expenses of the prior years when the properties were operated by Gulf Oil. According to this projection, the production payment would pay out in the fourth year after acquisition of the properties by the petitioners and their coowners. The projection

---

[5] The ACB transaction is a variation of the ABC transaction described in fn. 2. In the ACB transaction, A sells the producing oil and gas leases to C, who sells the working interest in such leases to B for a cash consideration, subject to a retained production payment. C then borrows an amount equal to the production payment from a lending institution, with the production payment as security for the loan.

further showed that income from the properties accruing to the working interest during the period the production payment was outstanding would not be sufficient to cover the direct expenses and overhead.

The income accruing to the working interest did not meet projected amounts. Six months after the Gulf properties were purchased, there occurred a 10-cent-per-barrel drop in the price of oil produced from each of the wells. Expenses exceeded projections because of expenditures made for replacement of certain leasehold equipment.

The petitioners purchased their interests in the Baylor and Gulf properties in order to operate them in the hope and expectation of making a profit.

In each of these consolidated cases, the respondent disallowed deductions claimed by the petitioners for losses incurred in the operation of the Baylor and Gulf properties.

OPINION

In this case, the principal question is whether the operator who purchased a working interest in an oil and gas leasehold subject to a reserved production payment may deduct all of the expenses of lifting the oil which accrues to both the working interest and the production payment. In a number of unpublished rulings, the respondent has applied the rule known as the loss capitalization rule.[6] Loftin, Skinner, and Simons, "Special Tax Problems of Purchasers of Operating Mineral Interests in ABC Transactions—The 'Loss Capitalization Doctrine' and Allocation of the Cash Consideration," P-H. Oil & Gas Taxes, par. 4208.6 (1967). In general, the respondent holds that all the costs of operating the leasehold are deductible by the operator. However, according to his rulings which set forth the loss capitalization rule and his position in this case, if B, the purchaser and operator of the working interest, expects the operating expenses to exceed the income accruing to the working interest while the production payment is outstanding, the excess expenses are not deductible but must be capitalized and added to the basis of the lease. In this case, the respondent takes the position that since the operating costs of the Gulf properties were expected to exceed the operator's income while the production payment was outstanding, the excess expenses must be

---

[6] The only court case to have considered this rule apparently accepted and applied it, although it did so without discussion or explanation, perhaps because the loss capitalization issue was a very minor part of the case. *Burns* v. *United States,* an unreported case (N.D. Tex. 1965, 16 A.F.T.R. 2d 5015 ; 65–1 U.S.T.C. par. 9385). It appears that the rule urged by the respondent and applied by the court in that case differed in certain respects from the rule as the respondent seeks to apply it herein. Heard, "Capitalization of Excess Operating Expenses in ABC Transactions—Fallacy and Fallout," 18 Oil & Gas Inst. 451, 457 (Sw. Legal Fdn. 1967); "Loss Capitalization in ABC Transactions." 14 Oil & Gas Tax Q. 175, 178 (1965).

capitalized. In connection with the Baylor properties, his position is that the petitioners should have anticipated that they would incur a loss while the production payment was outstanding, and accordingly, the excess expenses are not deductible.

In support of his position, the respondent argues that the excess expenses were incurred to free future production from the obligation of the production payments so that future production would all inure to their benefit as owners of the working interest. Therefore, the excess expenses were incurred to secure future income and not to earn present income, and are not deductible under section 162(a)[7] or section 167(a)[8] by reason of section 263(a)(1).[9]

We are unable to agree with this reasoning. We have found that when the petitioners purchased their interests in the Baylor and Gulf properties, they did so with the purpose of operating them for profit. Obviously, most of their profit would be earned after the satisfaction of the production payments. However, we find no authority in the law for holding that there must be an expectation to make a profit each year for the business expenses of that year to be deductible. In fact, section 1.162–1 of the Income Tax Regs. provides: "The full amount of the allowable deduction for ordinary and necessary expenses in carrying on a business is nevertheless deductible, even though such expenses exceed the gross income derived during the taxable year from such business." Furthermore, the courts have often allowed deductions for current losses when they were convinced that the taxpayer did in good faith expect to make a profit ultimately. *Doggett* v. *Burnet*, 65 F. 2d 191 (C.A.D.C. 1933), reversing 23 B.T.A. 744 (1931); *George D. Widener et al.*, 8 B.T.A. 651 (1927), affd. 33 F. 2d 833 (C.A. 3, 1929). Cf. *Harold Haft*, 40 T.C. 2 (1963). Often, the organizers of a new business recognize that they are going to lose money in the early years of the business; they are going to endure such losses with the hope that, in the long run, the business will be profitable. To adopt the theory urged by the respondent in this case would mean that in the case of every such new business, their early losses would not be deductible. Clearly,

---

[7] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *

[8] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

[9] SEC. 263. CAPITAL EXPENDITURES.

(a) GENERAL RULE.—No deduction shall be allowed for—

    (1) any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. * * *

that is not the law. E.g., *Peerless Stages, Inc.*, 43 B.T.A. 111 (1940), affd. 125 F. 2d 869 (C.A. 9, 1942).

Although we do not agree with the respondent's reasoning, we do agree that a portion of the operating expenses is not deductible by the operator. In *Thomas* v. *Perkins*, 301 U.S. 655 (1937), it was held that the owner of a production payment had an economic interest in the oil in place and that the oil which accrued to the production payment was not includable in the gross income of the operator. Thus, when the petitioners purchased a working interest in the Baylor and Gulf properties in an ABC or ACB transaction, they acquired no rights to the oil accruing to the production payment; that oil was owned in place by the owner of the reserved production payments. Yet, as a part of the ABC or ACB transaction, the petitioners agreed to bear all the costs of production. When the petitioners lifted the oil, they were producing oil, some of which belonged to them and some of which belonged to the holder of the production payment. Accordingly, the expenses which the petitioners incurred to lift the oil were in part attributable to the production of income for someone else. The expenses which they incurred and which are properly allocable to the lifting of the oil accruing to the production payment were not their expenses and are not deductible by them. *Deputy* v. *DuPont*, 308 U.S. 488 (1940).

When the petitioners agreed to pay the costs of lifting the oil which accrued to the production payments, they were in effect agreeing to make additional payments for the acquisition of the properties. Thus, the costs which are attributable to the production payments but which were borne by the petitioners are an additional cost of acquiring the properties, and the petitioners may capitalize them by adding them to their bases in the properties.

The petitioners suggest that no part of their costs should be attributable to the production payments and disallowed to them because no similar attribution is made to the royalty which is due the landowner. The answer to that argument is that we do not have that question before us. In this case, the respondent has disallowed a portion of the operator's costs on the basis that such costs are attributable to the production payment, and that is the only issue which we can consider in this case.

Since we have concluded that the part of the operator's costs which is attributable to the lifting of the oil accruing to the production payment is not deductible by the operator, we must next decide what portion of the operating expenses should be allocated to the working interest and what portion to the production payment. It has been suggested that operating expenses should be allocated between the production payment and the working interest in the same ratio as the production is divided between those interests. See Hambrick, "Another

Look at Some Old Problems—Percentage Depletion and the ABC Transaction," 34 Geo. Wash. L. Rev. 1, 45-48 (1965). This approach has been considered by the respondent in the past, but he has not taken such position in this case; nor have the petitioners urged us to adopt such an allocation, since it would appear to result in allocating a larger portion of the operating expenses to the production payment. Accordingly, we express no views regarding its merits.

The only allocation method proposed in this case is that suggested by the respondent. Under his loss capitalization rule, when a profit is foreseeable, none of the expenses are allocated to the production payment; they are all deductible by the operator. On the other hand, when a loss is anticipated, the excess operating expenses are allocated to the production payment. However, we see no reason why the allocation should turn on the foreseeability of a profit or loss. For example, the anticipation of a profit is no reason to allocate none of the costs to the production payment.

We do not accept, as a general rule, that the allocation of the excess of operating expenses over income is the proper method for determining the amount to be allocated to the production payment, but under the circumstances, we are constrained to apply that rule in this case. Although the petitioners opposed the loss capitalization rule, they suggested no alternative. Thus, the only rule that has been considered by the parties and argued in the case is the one allocating the excess operating expenses to the production payment; and we are of the opinion that it would be inadvisable for us to adopt and apply an allocation rule not raised and argued in the case. Since we have concluded that some amount of the operating expenses should be allocated to the production payment, since the respondent has urged us to allocate the excess expenses, and since the petitioners have not offered us any alternative, we have decided to treat the excess as allocable to the production payment in this case, although we are not adopting such a method of allocation as a general rule in similar cases.

Now we turn to a consideration of the questions relating to the determination of whether there was an excess of operating expenses over income, including the questions concerning what expenses are to be included for purposes of this computation. At the outset, we must decide whether the determination is to be made on the basis of a transaction or on the basis of a "property" as defined in section 614. There were two transactions—the purchase of the Baylor properties and the purchase of the Gulf properties, but each transaction included several "properties." The respondent argues that we ought to look separately at the income and expenses of each "property" as defined by section 614, which make up the Baylor properties and the Gulf

properties and deny deductions in an amount equal to the aggregate of losses so computed. The petitioners contend that we should make our computations on a transaction basis, by comparing the operator's income from all the Baylor properties against all the expenses of operating those properties, and all the operator's income of Gulf properties with all the operating expenses thereof.

Our reason for attributing a portion of the operating costs to the production payment and requiring the operator to capitalize that portion is that the payment of such expenses constitutes the payment of additional consideration for the acquisition of the properties. The terms of each transaction were stated as aggregate amounts; that is, there was a single cash price to be paid and a single primary amount of each production payment, although the transaction included several "properties" as defined in section 614. In like manner, it seems to us that the determination of whether additional consideration was paid by the petitioners through the payment of the operating costs attributable to the production payments should be made on the transaction basis. Some "properties" included in a transaction may result in losses while the production payment is outstanding, and other "properties" in the transaction may produce income. Under the respondent's theory, the losses, and the amounts to be capitalized, would not be offset by the income from the other "properties"; but we think that the additional consideration should be determined by aggregating the income and losses on the "properties" included in the transaction. That is the way the amount of the cash price and the production payments was determined for each transaction.

The next step is to determine the costs of production subject to allocation between the working interests and the production payment. The petitioners do not dispute that if an allocation is proper at all, direct expenses and an allowance for overhead should be allocated. However, they disagree with the respondent's contention that depreciation on leasehold equipment is also an allocable cost. The petitioners' argument appears to be that section 167 allows a deduction for a reasonable allowance for depreciation for property used in a trade or business and that since the equipment was used in their trade or business, they are entitled to the full deduction for depreciation. Apparently, they are also contending that the respondent's position in this case is inconsistent with his own ruling and regulations—Rev. Rul. 60–344, 1960–2 C.B. 186, and sec. 1.612–4(c)(2), Income Tax Regs.

For purposes of determining the cost of producing income, depreciation—inasmuch as it represents a using up of capital—is as much an "expenditure" as the using up of labor or other items of direct cost. It is true that direct costs represent realized charges to net worth,

whereas depreciation represents an unrealized charge (cf. *Maurice S. Gordon*, 37 T.C. 986 (1962)), but this distinction is not relevant to determining the costs of producing income. The reasoning which denies to the operator a deduction for the direct, or realized, costs of producing income for someone else equally compels the denial of a deduction for the exhaustion of assets to produce that income, an unrealized cost. Both types of expenditures represent to the operator additional costs of acquiring the leasehold rather than expenses of producing his current income.

Furthermore, when property is both used in a trade or business and used for other purposes, it has been held that the depreciation deduction must be allocated between the two uses and that only the portion allocable to the use in the trade or business is deductible. The respondent has ruled that when construction equipment was used in the construction of capital improvements to be used in the taxpayer's business, the depreciation on such equipment was not deductible but must be capitalized. Rev. Rul. 59–380, 1959–2 C.B. 87. In an early decision by this Court, *Great Northern Railway Co.*, 8 B.T.A. 225 (1927), we determined that an allocable portion of depreciation on railroad equipment used in part to transport men and material in connection with the construction by the railroad of additional capital facilities could not be deducted but instead had to be capitalized. In like manner, when property is used both in the trade or business and for personal purposes, we have held that the depreciation must be allocated between the two uses and only the portion attributable to the business use is deductible. See, e.g., *Clarence Peiss*, 40 T.C. 78 (1963). The authority of this rule is not impaired by our decision in *Great Northern Railway Co.*, 30 B.T.A. 691 (1934), since it was found in that case that constructing its own capital improvements was part of the taxpayer's trade or business. Clearly, there is no basis for finding that the operators in this case were in the trade or business of producing oil for the holders of production payments.

Finally, we are not persuaded by the argument that the respondent's position is inconsistent with other positions taken by him. What expenses may properly be treated as deductible under section 162 does not appear to us to have any relevancy in determining whether depreciation attributable to the acquisition of the property may be deducted or must be capitalized. Similarly, authorities which define "cost of goods sold" and "gross income" for purposes of the personal holding company tax, or define "development costs," as distinguished from "operating costs," for purposes of section 1.612–4, Income Tax Regs., are not in point.

We thus hold that depreciation of equipment on the leases herein involved must be allocated between the working interest and the production payment, and that the portion allocated to the production pay-

ment is not deductible by the petitioners but must be capitalized as an additional cost of the properties purchased. For purposes of this case, the total depreciation of equipment on the Baylor and Gulf properties should be added to the other costs of producing oil from each group of properties, in order to determine whether and to what extent there are nondeductible excess costs.

The respondent also argues that the lifting costs should include the cost of installing the waterflood on the Baylor properties; according to the testimony, the cost of the waterflood was in the vicinity of $200,000. He argues, on the authority of *James A. Lewis Engineering, Inc.*, 39 T.C. 482 (1962), affd. 339 F. 2d 706 (C.A. 5, 1964), that costs of installing a waterflood are operating costs rather than development costs. We need not decide this question, for the record shows that the waterflood was completely installed and operative prior to 1961. Therefore, even if installment costs were to be considered as operating costs, they would not be costs in the years before us.

The final question presented is how the amounts, if any, determined to be nondeductible acquisition costs of the Baylor properties and Gulf properties are to be allocated between the basis of the leasehold and the basis of the equipment. The respondent argues that such amounts should be allocated entirely to the basis of the leasehold. The petitioners, on the other hand, argue that they should be allocated between leasehold and equipment in the same manner as the cash price paid for the properties, that is, in accordance with their relative fair market values as stipulated and set forth in our Findings of Fact.

We believe that the respondent's position is correct. If the owner of the production payment had to bear the costs of lifting his share of the oil, he would demand a larger production payment in order to return him the same net amount. In other words, the operator, by bearing the costs of lifting the oil accruing to the production payment, reduces the gross amount of the production payment and has more oil left in the ground for his own use after the satisfaction of the production payment. By paying the cost of lifting the oil accruing to the production payment, the operator purchases more oil for his own use. Thus, the entire cost allocated to the production payment should be allocated to the operator's interest in the leasehold, and none of it is properly attributable to the equipment.

In summation, we hold that because losses suffered in the operation of the Baylor and Gulf properties are, for purposes of this case, deemed to be expenses allocable to the production payments, deductions claimed therefor are disallowed for 1961 and 1962. The excess of operating costs over income, determined on the basis of each transaction entered into by the petitioners, shall be treated entirely as additions to the petitioners' bases in the leasehold, and not as additions to

the bases of the depreciable leasehold equipment. The operating costs shall include the direct costs of lifting the oil accruing to the working interest and to the production payment, an allowance for overhead, and depreciation on leasehold equipment.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

TANNENWALD, *J.*, concurring: I am impelled to state my separate views in this case and *Producers Chemical Co.*, also decided this day, not because I have any basic disagreement with the majority decision but because I think it important to underscore what we have decided and what we have not decided. The complexities of the problems involved are such that there should be no misconceptions in this regard.

As I understand it, we have disapproved of respondent's loss capitalization based upon expectation of profit rule and petitioner's claim that *all* expenses should under *all* circumstances be deducted by the operator. We also have indicated that some of those expenses should be capitalized. But we have expressly left open what method of determining the capitalized amount should be adopted—i.e., should it be framed in terms of a portion of total expenses, the entire amount of the net loss sustained by the operator, a portion thereof, or otherwise? Similarly, we left open the question of the deductibility by the holder of the production payment of all or any portion of the expenses incurred by the operator during the period of the production payment and required to be capitalized by him. We did this in order to permit respondent to consider alternatives in light of the totality of the complexities involved and to afford respondent and taxpayers the further opportunity to litigate the validity of whatever alternative respondent may decide upon.

Our conclusion that some capitalization of expenses was in order still left us with the problem of deciding the amount which should properly be capitalized. Since the record did not reveal any other basis for determining such amount which would be more favorable to the petitioner, we adopted respondent's calculations as a mathematical tool for arriving at the amount of tax due, subject to modification to reflect our views on other elements involved. In so doing, we recognized the fact that respondent was not entitled to any increase in the amount set forth in the deficiency notice since he neither pleaded nor otherwise asserted at trial any claim therefor.

In short, we have navigated only as far as was necessary to decide these particular cases and have carefully refrained from entering unchartered waters.

RAUM, DAWSON, and IRWIN, *JJ.*, agree with this concurring opinion.

FEATHERSTON, *J.*, dissenting: Respondent's loss capitalization rule is based on the legal theory that where a taxpayer does not expect to make a profit while an oil payment is being paid out, the excess of expenses over current income must be considered expenses to secure future income, not deductible under section 162(a) but subject to capitalization by reason of section 263(a)(1). The majority rejects this reasoning, and I concur. But the majority then proceeds to sustain the deficiencies on a ground which respondent has assiduously refrained from arguing, i.e., that a portion of the operating costs *as such* should be capitalized as a cost of acquiring the working interest. Moreover, we are not informed how this "portion" is to be computed as a general rule—only that, in the case at bar, we will accept respondent's calculation despite its discredited parentage. Insofar as the majority opinion goes beyond rejection of the loss capitalization theory I respectfully dissent.

I do not question the power of the Court to find and adopt a different legal theory to sustain respondent's deficiency, but I do question the wisdom of doing so in an area where fine distinctions are frequently fundamental yet "hardly can be held in the mind longer than it takes to state them," *Burton-Sutton Oil Co.* v. *Commissioner*, 328 U.S. 25, 38 (1946) (separate opinion, Frankfurter, *J.*), when neither party has been given an opportunity to brief the merits of the new theory, and the Court can define its new theory only in generalities. Petitioner's counsel has ably presented his refutation of the loss capitalization doctrine, and his position has been accepted by the Court. I am not prepared to determine, a priori, that he has no argument against the Court's new-found theory.

Perhaps of even greater importance, respondent has not been heard on the matter. We know that the tax administrators were early confronted with the necessity of making certain choices as to how oil and gas transactions should be taxed, and that they attempted to find a theoretical foundation for their choices. See, e.g., G.C.M. 22730, 1941-1 C.B. 214. And tax literature tells us that the Revenue Service has issued rulings with apparent consistency allowing the working-interest owner to deduct all operating expenses except those subject to disallowance under the so-called loss capitalization theory. See Heard, "Capitalization of Excess Operating Expenses in ABC Transactions—Fallacy and Fallout," 18 Oil & Gas Inst. 451 (Sw. Legal Fdn. 1967); Loftin, "Recent Developments in Oil and Gas Taxation," 17 Oil & Gas Inst. 430 (Sw. Legal Fdn. 1966). While we are not advised of the legal reasoning supporting these rulings, we may assume that it is symmetrical with the rationale of other administrative positions in this area. One

may wonder if the majority's new theory, once its generalities have been charted in specific directions, will fit the symmetry.

What is equally disturbing is the majority's failure to provide any real guidance for tax administrators or taxpayers as to what portion of the operating expenses we will require to be capitalized in the next case. Perhaps it will be based on an "allocation theory" which would allocate on the same basis as the oil produced is allocated, but this is not certain for the majority declines to pass on the question. Indeed, by disposing of this case on a computation having no necessary relationship to the amount of tax resulting from the application of its new theory, the majority sidesteps a host of questions (e.g., Should a portion of the expenses attributable to the royalty interest also be capitalized? Is the rule to be limited to ABC transactions?). Neither taxpayers nor tax administrators can be so cavalier.

When we are dealing with an area where tax consequences often control the economics of business transactions reasonable certainty of the law is essential. See Galvin, "G.C.M. 22730—Twenty-Five Years Later," 18 Oil & Gas Inst. 511 (Sw. Legal Fdn. 1967). We should not attempt to take half a step without letting those interested know where the next foot will fall. Having rejected the loss capitalization rule, I would enter decision for petitioner. I would leave the "allocation" theory to a case wherein it is presented and briefed by the parties—if and when respondent decides to use the theory at all.

DRENNEN, FORRESTER, and FAY, *JJ.*, agree with this dissent.