IDAHO POWER COMPANY, Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 26368.

United States Court of Appeals, Ninth Circuit.

April 10, 1973.

As Amended April 30, 1973.

Frank Norton Kern (argued), Lawrence C. Wilson, Reid & Priest, New York City, for petitioner-appellant.

William A. Friedlander (argued), Johnnie Walters, Asst. Atty. Gen., Tax Division, Dept. of Justice, K. Martin Worthy, Chief Counsel, IRS; Meyer Rothwacks, Elmer J. Kelsey, Gordon S. Gilman, Tax Division, Dept. of Justice, Washington, D. C., for respondent-appellee.

Before TRASK and CHOY, Circuit Judges, and McGOVERN,* District Judge.

TRASK, Circuit Judge:

The taxpayer, Idaho Power Company, appeals from a Tax Court decision denying taxpayer's depreciation deduction on equipment used in the construction of capital improvements. Under the Tax Court decision the taxpayer was ordered to pay deficiencies. in income taxes for the taxable years 1962 and 1963 in the amounts of $73,023.47 and $50,342.21, respectively.

The Tax Court ruled against the taxpayer on the single issue—whether the taxpayer is entitled to deduct depreciation on depreciable equipment to the extent such equipment is used in the construction of its own capital assets. The Tax Court treated the depreciation as a cost of the construction of the new facilities and ruled such costs must be capitalized as part of the basis of the property constructed under section 263 of the Internal Revenue Code of 1954.[1] We agree with the taxpayer's position that the current depreciation should be treated as a current deduction under section 167 of the Code.[2] The decision of the Tax Court is therefore reversed.

---

* Honorable Walter T. McGovern, United States District Judge, for the Western District of Washington, sitting by designation.

1. "§ 263. *Capital expenditures*
 (a) General Rule.—No deduction shall be allowed for—
 (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. This paragraph shall not apply to—
 (A) expenditures for the development of mines or deposits deductible under section 616,
 (B) research and experimental expenditures deductible under section 174,
 (C) soil and water conservation expenditures deductible under section 175, or
 (D) expenditures by farmers for fertilizer, etc., deductible under section 180."

2. "§ 167. *Depreciation*
 (a) General Rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
 (1) of property used in the trade or business, or
 (2) of property held for the production of income.
 (b) Use of certain methods and rates. —For taxable years ending after December 31, 1953, the term 'reasonable allowance' as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:
 (1) the straight line method,
 (2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual

The taxpayer is a public utility engaged in the production, transmission and sale of electricity. Since at least 1929, the taxpayer has regularly constructed additional transmission and distribution facilities using its own employees and equipment for a major part of the work. In 1962 it constructed $7,139,940.72 worth of facilities and in 1963, $5,642,342.79 worth. In some years it has used as many as 300 employees in construction and at the time of trial 140 were engaged in such work in question. During the years, the taxpayer has owned cars, trucks, trailers and radio equipment which have been used in part to operate and maintain existing facilities and in part to construct new capital assets.

◼ On its books the taxpayer capitalized the depreciation to the extent the equipment was used in the construction of capital assets in accordance with accounting procedures prescribed by the Federal Power Commission and adopted by the Idaho Public Utilities Commission.[3] On its income tax returns for 1962 and 1963, however, the taxpayer deducted all depreciation on its transportation equipment, including depreciation on the equipment to the extent it was used in construction. Such equipment was depreciated over a composite life of ten years. All other costs allocable to the constructed facilities, except

pension contributions, social security taxes and motor vehicle taxes, which were also deducted currently, were capitalized by the taxpayer. This included costs of operating and maintaining such equipment. The Commissioner of Internal Revenue disallowed and capitalized the deduction for depreciation on taxpayer's equipment to the extent that such equipment was used in the construction of capital assets and allowed instead a deduction for depreciation of the amounts so capitalized over the useful life of the property so constructed. The construction, consisting principally of transmission and distribution facilities, had useful lives of 30 years or longer. The result of this adjustment was the net disallowance by the Commissioner of depreciation claimed by the taxpayer during the years 1962 and 1963 in the respective amounts of $140,429.75 and $96,811.95.

## I. THE DEPRECIATION DEDUCTION

A re-examination of the purpose of the depreciation deduction, its place in the statutory scheme and its history will assist us in solving the problem. It is the basic theory of depreciation that capital assets which are used in the business should not be exhausted without a provision for their replacement. To that end depreciation over the life of the asset provides the means by which

allowance been computed under the method described in paragraph (1),
(3) the sum of the years-digits method, and
(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2)."

3. It should be noted that the taxpayer in Spring Valley Water Co., 5 B.T.A. 660 (1926), charged interest payments on

funds borrowed for construction of a dam to its capital account as required by law for public utilities. The taxpayer was allowed a current deduction for such payments, notwithstanding the method of accounting used for its books. The fact that the taxpayer in the case at bar was required to capitalize the depreciation on its books for purposes of the Federal Power Commission and the Idaho Public Utilities Commission is likewise irrelevant as to the proper tax treatment of depreciation deductions. See Old Colony Ry. Co. v. Commissioner, 284 U.S. 552, 562, 52 S.Ct. 211, 76 L.Ed. 484 (1931); Mine Hill & Schuylkill Haven R. R. Co. v. Smith, 184 F.2d 422 (3rd Cir. 1950), cert. denied, 340 U.S. 932, 71 S.Ct. 496, 95 L.Ed. 673 (1951).

the taxpayer can recover its cost. One way of expressing this very practical approach was that of the Supreme Court in Knoxville v. Knoxville Water Co., 212 U.S. 1, 13–14, 29 S.Ct. 148, 152, 53 L.Ed. 371 (1909):

"A water plant, with all its additions, begins to depreciate in value from the moment of its use. Before coming to the question of profit at all the company is entitled to earn a sufficient sum annually to provide not only for current repairs but for making good the depreciation and replacing the parts of the property when they come to the end of their life. The company is not bound to see its property gradually waste, without making provision out of earnings for its replacement. It is entitled to see that from earnings the value of the property invested is kept unimpaired, so that at the end of any given term of years, the original investment remains as it was at the beginning. It is not only the right of the company to make such a provision, but it is its duty to its bond and stockholders, and, in the case of a public service corporation at least, its plain duty to the public. If a different course were pursued the only method of providing for replacement of property which has ceased to be useful would be the investment of new capital and the issue of new bonds or stocks. This course would lead to a constantly increasing variance between present value and bond and stock capitalization—a tendency which would inevitably lead to disaster either to the stockholders or to the public, or both."

Although that case did not involve an income tax problem, it states the underlying theory of the deduction.

The purpose of the depreciation allowance under the Code is "to permit the taxpayer to recover his capital investment in wasting assets free of income tax." 4 Mertens, Law of Income Taxation § 23.04. The Supreme Court has said that the purpose of the depreciation deduction is to create a fund to restore the property, to the extent of the investment of the taxpayer, at the end of its useful life:

"The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein." Detroit Edison Co. v. Commissioner, 319 U.S. 98, 101, 63 S.Ct. 902, 904, 87 L.Ed. 1286 (1943).

In Massey Motors, Inc. v. United States, 364 U.S. 92, 96, 80 S.Ct. 1411, 1414, 4 L.Ed.2d 1592 (1960), the Supreme Court allowed a depreciation deduction on automobiles used by dealers or their employees, explaining:

"Such assets, employed from day to day in business, generally decrease in utility and value as they are used. It was the design of the Congress to permit the taxpayer to recover, tax free, the total cost to him of such capital assets; hence it recognized that this decrease in value—depreciation—was a legitimate tax deduction as business expense. It was the purpose of § 23(l) and the regulations to make a meaningful allocation of this cost to the tax periods benefited by the use of the asset." [4]

4. The Treasury Regulations under the 1954 Internal Revenue Code are to the same effect:

"§ 1.167(a)–1. Depreciation in General.

(a) *Reasonable allowance.* Section 167(a) provides that a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business or of property held by the taxpayer for the production of income shall be allowed as a depreciation deduction. The allowance is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), so that the aggregate of the amounts set aside, plus the

The issue here does not affect the amount of the depreciation to which the taxpayer is entitled. Whether it is spread over a ten-year life or a thirty-year life, the amount remains the same. It does affect the timing of the recovery of the depreciation and thus might have a vital effect on the ability of a taxpayer to maintain and replenish its equipment inventory without depleting its working capital or burdening its borrowing capacity.

The legislative history of the depreciation deduction clearly supports our decision in favor of the taxpayer. "Prior to the enactment of the Internal Revenue Code of 1954, the statutory provisions for depreciation were singularly brief." 4 Mertens, *supra* at § 23.01. Section 23(*l*) of the 1939 Act contained only a bare statement similar to the general rule in section 167(a) of the 1954 Act,[5] and a two sentence paragraph stating the method of computation as between a life tenant and a remainderman. When Congress adopted the Internal Revenue Code of 1954, however, it gave particular attention to liberalized depreciation allowances. It provided for the use of new methods and rates, in addition to the standard straight line method. These included a declining balance method, a sum of the years-digits method and a fourth method which was any one consistently applied so long as the total at the end of each year did not exceed the allowances which would have resulted from the use of the declining balance method.[6]

Further, the report of the Ways and Means Committee on H.R. 8300, which became the Internal Revenue Code of 1954, stated at the beginning of its discussion of this subject:

"Your committee's bill provides for a liberalization of depreciation with respect to both the estimate of useful life of property and the method of allocating the depreciable cost over the years of service." H.R. No. 1337, 83rd Cong., 2nd Sess., 1954 U.S.Code Cong. & Admin.News at 4047.

The report emphasized the importance of the liberalized policies of the bill. It pointed out its reliance upon the use of an improved declining balance method of computing depreciation which "concentrates deductions in the early years of service and results in a timing of allowances more in accord with the actual pattern of loss of economic usefulness." *Id.* at 4048.

The report continued:

"More liberal depreciation allowances are anticipated to have far-reaching economic effects. The incentives resulting from the changes are well timed to help maintain the present high level of investment in plant and equipment. The acceleration in the speed of the tax-free recovery of costs is of critical importance in the decision of management to incur risk. The faster tax writeoff would increase available working capital and materially aid growing businesses in the financing of their expansion. For all segments of the American economy, liberalized depreciation policies should assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living." *Id.*

---

salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property as provided in section 167(g) and section 1.167(g)-1."

5. *Supra* note 2.

6. The Ways and Means Committee noted: "The depreciation allowances under this method, therefore, [declining-balance] are considerably larger in the early years of the life of a property than those resulting from the straight-line method. The declining-balance method at twice the appropriate straight-line rate will write off approximately 40 percent of the cost of an asset in the first quarter of its service life and two-thirds of the cost in the first half of its life." H.R. No. 1337, 83rd Cong., 2nd Sess., 1954 U.S.Code Cong. & Admin.News at 4047.

Obviously the decision of the court below does not permit the purpose of either the statute, the regulations, the legislative history or the cases interpreting them from being achieved. The assets, for which a depreciation deduction is sought here, have a useful life of ten years. No dispute appears to exist as to this point. If the plain language of the statute is to be followed, the taxpayer should by depreciation allowances recover the cost of those assets within that ten-year period. Yet such costs will not be fully recovered for 30 years if the Commissioner's determination requiring transfer of the depreciation to the new asset is applied.

## II. TAXPAYER'S ARGUMENT

The taxpayer argues that deductions specifically allowed and set out under the Internal Revenue Code of 1954 should not be capitalized even though incurred by the taxpayer in constructing facilities for its own use. Such deductions include interest (section 163), taxes (section 164) and depreciation (section 167). These particular deductions, expressly enumerated in the Code, differ from the general deduction for ordinary and necessary business expenses, which is not available whenever the amount expended is determined to be a capital expenditure rather than a current business expense. This interpretation of the Code's overall scheme is in harmony with the Tax Court's decision in All-Steel Equipment Inc., 54 T.C. 1749 (1970), rev'd on other grounds, 467 F.2d 1184 (7th Cir. 1972).

The issue there was whether certain expenditures for taxes, losses and research and experiment where to be included in the cost of inventory (comparable to the capitalization of expenditures for capital assets). Because these three items are expressly listed in the Code as proper deductions under sections 164, 165 and 174, they are not to be deferred even though they relate to inventory or capital items. The Tax Court explained:

"Secondly, the petitioner contends that the respondent also erred in his determination by requiring the inclusion of certain costs in inventory even though the current deductibility of such costs is expressly authorized by the Code and regulations. The expenditures referred to by the petitioner involve costs incurred for repairs, taxes, losses, and research and experiment. We agree with the petitioner that such expenditures are currently deductible and are excludable from inventory costs.

"Deductions for taxes, losses and research and experiment are expressly authorized in the year the taxes are paid or accrued, the losses are sustained, or the research and experimental expenditures are paid or incurred. Secs. 164, 165, 174. Neither the statutory provisions nor the regulations indicate in any way that such deductions are limited to current expenses as distinguished from capital expenditures for the acquisition of capital assets or inventory. To the contrary, it has been held that deductions expressly granted by statute are not to be deferred even though they relate to inventory or capital items. Montreal Mining Co., 2 T.C. 688 (1943); Spring Valley Water Co., 5 B.T.A. 660 (1926); Pacific Coast Redwood Co., 5 B.T.A. 423 (1926). See also Joe W. Stout, 31 T.C. 1199 (1959), affirmed and modified on other issues sub nom. Rogers v. Commissioner, 281 F.2d 233 (C.A. 4, 1960). *Cf.* sec. 266; Rev. Rul. 141, 1953–2 C.B. 101. Moreover, section 174 expressly states that research and experimental expenditures may be treated 'as expenses which are *not chargeable to capital account.*'" 54 T.C. at 1759.

Depreciation, under section 167, is likewise expressly listed as a proper deduction and no exception is made should it relate to a capital item.[7]

---

7. Depreciation was apparently not before the court in *All-Steel Equipment, Inc.*

The precise issue of this case was raised in an early railroad case. Great Northern Ry. Co., 30 B.T.A. 691 (1934). The railroad there, like the taxpayer here, used its equipment for the construction of additions to the taxpayer's property. The court reversed the Commissioner's determination and held that the full amount of depreciation of the equipment, including the period that it was used for construction, should be allowed. The court decided the equipment was used by its owner in a trade or business as the taxpayer maintained and that "it is a part of the regular business of a railroad to construct additional capital facilities for the transaction of its business as a common carrier." 30 B.T.A. at 708. The allowance of the depreciation deduction rather than capitalization of such costs was deemed appropriate because the statutory conditions for the deduction were satisfied.[8]

In further support of its position, taxpayer points out that section 263 providing for capital expenditures states:

"(a) . . . No deduction shall be allowed for—

(1) Any amount *paid out* for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." (Emphasis supplied).

The use of the term "paid out," argues the taxpayer, was not without significance. There is nothing in the Internal Revenue Code which says that for purposes of section 263 depreciation is an amount "paid out" or an "expenditure." On the contrary in construing other sections, the decisions have held that depreciation is not an amount "paid out." In section 170(a)(1), for example, a deduction is allowed for ". . . any charitable contribution . . . payment of which is made within the taxable year." It has been held that an allowance for depreciation is not a pay-

ment within the meaning of this section. Thus in Orr v. United States, 343 F.2d 553 (5th Cir. 1965), a taxpayer used his automobile and airplane in work for the Methodist Church. The court held that a charitable deduction was not permissible to the extent of the depreciation arising from such activity because such an allowance was not a payment.

"It is entirely possible, as the taxpayer suggests, that Congress and its Committees were not thinking of depreciation when they used the word 'payment'. The absence of any evidence as to whether Congress focused on this problem provides no basis for extending the meaning of payment to include 'depreciation'. A depreciation expense is an indispensable element in accounting. But it is not a 'payment', not a transfer of money or property. We are bound by plain, prosaic language of the statute." 343 F.2d at 556.

In Clinton H. Mitchell, 42 T.C. 953 (1964), the Tax Court said:

"Depreciation is a 'decrease in value.' Massey Motors, Inc. v. United States, 364 U.S. 92 [80 S.Ct. 1411, 4 L.Ed.2d 1592]. It is not a payment, or expenditure, or an out-of-pocket expense. Hence, it cannot be considered as a contribution, payment of which is made within the taxable year." 42 T.C. at 973.

As another example, we note that section 213 of the Internal Revenue Code provides for deduction of medical and dental expenses equal to:

"(1) the amount by which the amount of the expenses paid during the taxable year . . . exceeds 3 percent of the adjusted gross income,
. . . "

In Maurice S. Gordon, 37 T.C. 986 (1962), it was held that depreciation on an automobile used to transport a taxpayer's son to a doctor could not qualify

---

8. The revenue laws have uniformly required that a depreciation deduction be allowed for "property used in the trade or business." 4 Mertens, Law of Federal Income Taxation § 23.03.

as a medical expense upon the ground that it was not "an amount paid."

"The statute permits the deduction for 'expenses paid' and 'amounts paid' and respondent correctly interprets the statute as permitting deduction for 'medical expenses actually paid.' Sec. 1.213–1(a), Income Tax Regs. Depreciation is a 'decrease in value'. Massey Motors Inc. v. United States, 364 U.S. 92, 96 [80 S.Ct. 1411, 4 L. Ed.2d 1592]. Any allowance for depreciation is not an 'expense paid' or 'amount paid.' " 37 T.C. at 987.

It appears to us there is both merit and judicial support for the taxpayer's argument here.

### III. THE TAX COURT DECISION

The Tax Court disposed of the taxpayer's arguments by emphasizing that depreciation incurred in the acquisition of capital assets should be treated as part of the cost thereof. In Revenue Ruling 59–380, 1959–2 Cum.Bull. 87, the Internal Revenue Service specifically dealt with the issue in this case:

"Depreciation sustained on construction equipment owned by a taxpayer and used in the erection of capital improvements for its own use is not an allowable deduction, but shall be added to and made a part of the cost of the capital improvements. So much thereof as is applicable to the cost of depreciable capital improvements is recoverable through deductions for depreciation over the useful life of such capital improvements.

"In the instant case the capital improvements constructed constitute property to be used in the trade or business or property held for the production of income. However, the building equipment used in the construction cannot be considered as property used in the regular trade or business of the taxpayer."

9. The Court of Claims approved the decision of the Trial Commissioner. Neither the taxpayer nor the United States took

In a recent case factually similar to this case, the Court of Claims followed Revenue Ruling 59–380. Southern Natural Gas Co. v. United States, 412 F.2d 1222, 1264–1269, 188 Ct.Cl. 302 (1969).[9] The taxpayer contends the court's decision was erroneously based on incorrect assumptions. We agree. First, the Court of Claims could see no reason "for carving out a special exception for depreciation" on the automotive equipment of the company to the extent it was used to construct additional pipelines for its own capital improvements. Neither the Southern Natural Gas Company nor the Idaho Power Company, however, was seeking a special exception. Both based their claims on the express language of the Internal Revenue Code authorizing a depreciation deduction.

Second, the Court of Claims was concerned that a double recovery of cost would result if a depreciation deduction were currently allowed on the equipment —first, when the depreciation was deducted and second when the constructed asset was depreciated or sold. This assumption is patently incorrect. There is no possibility of double recovery because the cost basis of the capital asset would not include the depreciation theretofore deducted.

Third, the court harbored an unfounded fear that the interpretation urged by the appellant if pushed to its logical conclusion would leave the taxpayer without a basis for self-constructed assets. A taxpayer's actual expenditures for labor and materials, however, must be capitalized as part of the basis of the capital improvements under the requirements of section 263 which provides for capitalization of amounts "paid out" for capital assets. Such expenses have to be capitalized even though they are expended for self-constructed assets. Also, as we have noted above, the costs of operating and maintaining the equipment must be capitalized. For these reasons we are not persuaded by South-

exception to the Commissioner's finding on the issue involved here.

*ern Natural Gas* and we conclude that Revenue Ruling 59–380 is an improper and incorrect interpretation of the law.[10]

 Furthermore, the strong factual record in this case supports the taxpayer's contention that equipment used to construct its own capital improvements is used in the trade or business of the taxpayer as section 167 requires. The continuity and regularity of taxpayer's construction activities, the number of employees engaged in construction and the amounts expended on construction all point to the conclusion that construction of facilities is a major aspect of the taxpayer's trade or business. These activities are auxiliary operations incident to the taxpayer's principal trade or business of producing, transmitting, distributing and selling electrical energy within the meaning of section 167.[11] We, therefore, are constrained to distinguish this case from *Southern Natural Gas* where the court determined the taxpayer's equipment was not used in the taxpayer's trade or business to the extent it was used to construct capital assets.[12]

Other cases cited by the Tax Court concerning oil and gas leases are factually distinguishable from the self-constructed capital asset cases. In L. W. Brooks, Jr., 50 T.C. 927 (1968), and Producers Chemical Co., 50 T.C. 940 (1968), the issues involved the allocation of operating costs between two taxpayers—the operator's working interest in a leasehold and his production payment toward acquisition of the leasehold. These cases are analogous to allocation of costs between a life tenant and a remainderman. They are inapposite here where there is only one taxpayer involved. Likewise, Ben Perlmutter, 44 T.C. 382 (1964), aff'd, 373 F.2d 45 (10th Cir. 1967), cited by the Tax Court, was decided on a question of fact. No legal issue was raised as to the validity of a depreciation deduction for vehicles used in construction. The extent of their use, if any, was questionable and the issue thus was inconsequential. We do not deem it to be in point on the issue before us.

The judgment is reversed.

---

10. A revenue ruling, as distinguished from a regulation or a Treasury decision, does not have the force and effect of law. It is merely the opinion of a lawyer in an agency. A revenue ruling in conflict with revenue statutes is, therefore, without any force. *See, e. g.,* Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) ; Stubbs, Overbeck & Assoc. Inc. v. United States, 445 F.2d 1142 (5th Cir. 1971) ; Lincoln Savings & Loan Ass'n v. Commissioner, 422 F.2d 90 (9th Cir. 1970), rev'd on other grounds, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971) ; 1 Mertens, *supra* at § 3.20.

11. The undisputed testimony of the Superintendent of Engineering and Construction for the company was that construction was undertaken by the company because it thus obtains a better facility at less cost and because contractors are not always available to perform the work. R.T. at 22.

12. The Tax Court here stated, "[o]bviously the acquiring of capital improvements whether by purchase or construction is appropriate if not vital to petitioner's continued operation of its business of producing and selling electric energy . . . ." C.T. at 41–42.