THE MONTREAL MINING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 106876. Promulgated September 16, 1943.

*David A. Gaskill, Esq.,* and *Earl P. Schneider, Esq.,* for the petitioner.

*W. W. Kerr, Esq.,* for the respondent.

690

OPINION.

HILL, *Judge:* The first question is whether accrued state real estate, personal property, income, franchise, and miscellaneous taxes, Federal and state social security and unemployment compensation taxes, Federal capital stock tax, and Wisconsin privilege dividend tax may be included as items of cost in inventory at cost in computing gross income. Respondent contends that all such taxes, save the Wisconsin privilege dividend tax, must be treated as a deduction in ascertaining taxable net income. Respondent contends that the privilege dividend tax is a levy upon shareholders and, consequently, should be disregarded entirely in the taxation of petitioner's income. This raises a separate issue which we discuss hereafter. For present purposes, we assume this tax to be imposed against petitioner, as are the other taxes involved.

Obviously, taxes, paid or accrued, should not be treated as costs in the production of ore in .determining gross income and also as a deduction from gross income in determining taxable net income, for this would result in a double deduction. Unquestionably these taxes are properly deductible under section 23 (c) of the applicable revenue acts. Petitioner does not contend that it is entitled to such double deduction but contends that it is entitled to treat such taxes as costs in inventories at cost under the definition of cost in that connection in the applicable Treasury regulations. Also, petitioner argues that it would make no substantial difference which method of realizing credit against income is used provided the one adopted is consistently followed, since including these taxes in costs of inventory would simply defer the credit to the period in which the inventory is sold. We think, however, that in any given taxable year petitioner's income tax liability might and probably would vary, depending upon which treatment was accorded the taxes in question.

Section 22 (c) of the Revenue Acts of 1934 and 1936[1] are identical. They provide that inventories shall be taken upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting income. Pursuant to the authority so vested in the Commissioner, he, by regulation, provided certain bases upon which inventories might be taken. Among them are (a) cost, and (b) cost or market, whichever is lower. Petitioner adopted the latter basis and no question is raised regarding the

---

[1] SEC. 22. GROSS INCOME.

\* \* \* \* \* \*

(c) INVENTORIES.—Whenever in the opinion of the Commissioner the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer upon such basis as the Commissioner, with the approval of the Secretary, may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

propriety of the basis nor petitioner's right to use it. The Commissioner, by article 22 (c)–3 of Regulations 86 and 94, defined what is meant by cost in inventories at cost. We quote the applicable portions thereof:

ART. 22 (c)–3. *Inventories at cost.*—Cost means:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) In the case of merchandise produced by the taxpayer since the beginning of the taxable year, (a) the cost of raw materials and supplies entering into or consumed in connection with the product, (b) expenditures for direct labor, (c) indirect expenses incident to and necessary for the production of the particular article, including in such indirect expenses a reasonable proportion of management expenses, but not including any cost of selling or return on capital, whether by way of interest or profit.

It is evident that this regulation does not expressly include taxes as an item of cost. None the less, petitioner claims that the previously named taxes are factors properly entering into cost of inventory for one or both of two reasons, namely, (1) because the practice conforms with the accounting method consistently followed by petitioner and a large part of the industry, and (2) because the taxes in question are indirect expenses incident to and necessary for the production of the ore. We do not agree that the taxes in question are such indirect expenses nor that they are properly treated as such cost because of the accounting method in question.

While petitioner and a large part of the ore mining industry customarily have treated accrued taxes as part of the cost of inventory, it does not follow thereby that respondent is bound to adopt it as the best accounting practice in the trade or business and as most clearly reflecting income. The determination of the valuation of inventories, including therein all items entering into the basis and the approval of the accounting system used, is expressly confided to the Commissioner. As was said by the Court of Claims in *Riverside Manufacturing Co.* v. *United States*, 67 Ct. Cls. 117, certiorari denied, 279 U. S. 863:

\*　\*　\* It is true that the commissioner, in section 203 [similar to section 22 (c) of the Revenue Acts of 1934 and 1936], is directed to conform the inventories "as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income." The language quoted is directory and not mandatory, and obviously confides to the commissioner and Secretary the ascertainment of the best accounting practice in the trade or business. \*　\*　\*

Respondent has here determined that petitioner's practice of including the accrued taxes as part of cost of inventory was improper. In disallowing the taxes as cost, as defined in article 22 (c)–3 of the Treasury regulations, respondent thereby construed the term "indirect expenses" as not including taxes. His action must be sustained unless it is shown to be arbitrary and capricious. *Lucas* v. *Kansas City Struc-*

*tural Steel Co.*, 281 U. S. 264; *Mc Duffie* v. *United States*, 19 Fed. Supp. 239. The burden of such showing is on the petitioner. We think it has not sustained this burden. Such taxes are not shown to be indirect expenses incident to and necessary for the production of petitioner's ore and are not a part of the management expenses within the meaning of article 22 (c)-3 of the regulations. The type of indirect expenses contemplated by the regulations as includable in cost of inventory are such as are incident to operating charges. In this case, operating charges are expenses attributable to taking the ore from the mine.

The fact that petitioner's sole operation consists of mining in Wisconsin and that most of its income arises from this operation does not constitute payment or accrual of such taxes an indirect expense incident and necessary to the production of ore. Consistency in the administration of the revenue laws demands adherence to properly established administrative rules unaffected by the scope of a taxpayer's production or business. The taxes in question are not, therefore, includable as cost in the valuation of inventories at cost under the cited article of respondent's regulations.

The second question is whether or not respondent erred in deducting from gross income from the property the same taxes considered in connection with inventories in order to determine the net income from petitioner's mining property for the purpose of the limitation on percentage depletion, pursuant to section 114 (b) (3) of the Revenue Act of 1936. The statute provides that in the case of metal mines the allowance for depletion shall be 15 percent of the gross income from the property provided such allowance does not exceed 50 percent of the net income from the property (computed without allowance for depletion).

In accordance with the authority granted under the revenue acts, the Commissioner has, by regulation, defined the terms "gross income from the property" and "net income of the taxpayer from the property." Art. 23 (m)-1, (g) and (h), Regulations 86 and 94.[2] The validity of an analogous regulation (Treasury Regulations 74, art. 221-i) and the power of the Commissioner to promulgate such has

---

[2] ART. 23 (m)-1. *Depletion of mines, oil and gas wells, other natural deposits, and timber; depreciation of improvements.—* * * *

* * * * * * *

(g) "Gross income from the property" as used in section 114 (b) (3) and (4) and articles 23 (m)-1 to 23 (m)-28, inclusive, means the amount for which the taxpayer sells (a) the crude mineral product of the property * * *

(h) "Net income of the taxpayer (computed without allowance for depletion) from the property", as used in section 114 (b) (2), (3), and (4) and articles 23 (m)-1 to 23 (m)-28, inclusive, means the "gross income from the property" as defined in paragraph (g) less the allowable deductions attributable to the mineral property upon which the depletion is claimed and the allowable deductions attributable to the processes listed in paragraph (g) in so far as they relate to the product of such property, including overhead and operating expenses, development costs properly charged to expense, depreciation, taxes, losses sustained, etc., but excluding any allowance for depletion. Deductions not directly attributable to particular properties or processes shall be fairly allocated. * * *

been sustained by the Supreme Court. *Helvering* v. *Wilshire Oil Co.*, 308 U. S. 90. We are constrained to follow the Commissioner's definition, which specifically requires that gross income from property be reduced by the allowable deductions attributable to the mineral property upon which the depletion is claimed, including overhead expenses and taxes.

Since the controverted items which respondent deducted from gross income are, admittedly, taxes, it is apparent that the propriety of his action is supported by the explicit terms of the regulations. Moreover, as we have pointed out above, the taxes in question were overhead expenses attributable to the mineral property upon which the depletion is claimed. Petitioner's activities consisted entirely in mining ore. Thus, in arriving at the "net income of the taxpayer from the property" such taxes were deductible under the express provisions of the regulations. *Mirabel Quick Silver Co.*, 41 B. T. A. 401.

Respondent's action in deducting the named taxes, accrued in petitioner's fiscal year ended November 30, 1936, from net income for the purpose of limitation on percentage depletion for that year is approved.

The third question is whether the prepayment discounts herein allowed during the taxable year must be excluded from the sales price of ore in determining the amount of the gross income from the property for percentage depletion purposes. Respondent, in computing gross income from the property for such purpose for the taxable year ended November 30, 1937, reduced such sale price by $67,726.24, the total amount of such discounts in that taxable year.

The controversy on this item resolves itself into one concerning the proper accounting practice to be used in determining petitioner's "gross income from property."

For purposes pertinent here "Gross income from the property" as defined in article 23 (m)–1 (g), *supra*, means the amount for which the petitioner sold its ore.

Thus, it is apparent that a determination of the principal question depends upon the meaning of "the amount for which the taxpayer sells the crude mineral," which we term for the purposes of discussion "selling amount." Petitioner contends that "selling amount" means the contract price at which its ore is sold, less certain adjustments which are not in dispute, whereas respondent contends that it envisages the further subtraction of these discounts. The nature of the discounts must, therefore, be considered. This requires a brief resume of the circumstances of their adoption as well as their purpose.

The practice of granting discounts to customers has existed among iron ore mining companies for 50 or 60 years. It arose as a result of the peculiar terms of the sales contract, which, in turn, were conditioned by climatic elements, the locale of the mines and customers'

blast furnaces, and the necessity for continuous operation of the latter. The mines were located near the upper Great Lakes area, whereas the blast furnaces were adjacent to the lower lakes ports. Severe weather conditions confined shipping to a navigation season lasting from April to November. However, the blast furnaces were operated the year around, and therefore required a continuous even flow of raw materials. As a result of these circumstances, the steel companies contracted for their ore requirements by the year, the annual periods commencing in May, and the mining companies shipped the entire amount during the navigation season. The excess over customers' monthly needs during the navigation season went into the stock pile from which were drawn the materials to carry through the winter months. Since the customers used approximately uniform amounts of materials each month, it was customary that contract terms call for twelve equal monthly payments. Consequently, by November the mining companies would have shipped a year's supply but would have received payment for only about one-half thereof. The practice of allowing discounts arose to encourage the prepayment of monthly charges and thereby enable the sellers to obtain working capital which might otherwise have to be borrowed. The discount rates followed prevailing interest rates. In 1937 discounts were computed at a rate of 5 percent to 6 percent per year. Thus, if a customer on August 25 made a payment which was not due until October 25, it would be entitled to an allowance of one percent of that payment, assuming the annual rate to be 6 percent. On the other hand, if this customer delayed its October 25 payment by two months it would be required, in accordance with custom, to pay one percent interest for the use of the funds, the rate of interest conforming to the rate of discount as established by the particular contract. At no time could a mining company anticipate the amount or number of discounts it would be required to allow. What we have said regarding the industry applies in all particulars to petitioner. It is clear that these discounts are cash discounts made to expedite payments for ore purchased by customers, not trade discounts arising out of market conditions and resulting in a flat rate of prices irrespective of the time of payment. *American Cigar Co.*, 21 B. T. A. 464, 499; *Warfield-Pratt-Howell Co.*, 13 B. T. A. 305. Cf. *American Lace Manufacturing Co.*, 8 B. T. A. 419. Moreover, there can be no question that they approximate a fair interest rate.

The principle here invoked by petitioner is recognized and approved in respect of inventories at cost by a purchaser of merchandise in article 22 (c)–3 (2) of Regulations 94 as follows:

ART. 22 (c)–3. *Inventories at cost.*—Cost means:

*     *     *     *     *     *     *

(2) In the case of merchandise purchased since the beginning of the taxable year, the invoice price less trade or other discounts, except strictly cash discounts

approximating a fair interest rate, which may be deducted or not at the option of the taxpayer, provided a consistent course is followed. * * *

The optional method of treating cash discounts similar to the ones involved in the instant proceeding was recognized in the case of *Warfield-Pratt-Howell Co.*, *supra*, wherein we said:

Two methods of accounting for purchase cash discounts are in general use in business, and both have their advocates among the leading accounting authorities. Under one method, the discounts are deducted from the invoice prices and only the net amounts are charged against purchases. Under the other method the gross invoice prices are charged against purchases and cash discounts allowed are accounted for as financial income arising from the employment of business funds. It was undoubtedly in recognition of the fact that both of these methods were in general use, and that the effect of either on net income is the same, that taxpayers were extended the option in article 1583 of Regulations 45 [similar to Article 22 (c)-3 (2) of Regulations 94] to deduct or not to deduct from invoice prices the cash discounts, approximating a fair interest rate, provided a consistent course is followed. * * *

Under this authority it would appear that petitioner's customers, assuming they used inventories at cost, could treat the discounts in question either as income or a charge against cost, provided a consistent course is followed. Conversely, we think petitioner, in keeping with its long and consistent accounting practice and that of the industry, is entitled to treat such discounts as business expenses of the nature of so-called "financial items." We have previously held that cash discounts actually taken are thus properly regarded and are deductible as an ordinary and necessary expense. *American Cigar Co.*, *supra; Landesman-Hirschheimer Co.*, 15 B. T. A. 64; *Stein-Block Co.*, 23 B. T. A. 1162. Moreover, this accounting practice seems the better under the existing facts. Petitioner's fiscal year ended November 30, 1937, and deduction for cash discounts could embrace only allowances actually made during that fiscal year. Of necessity, part of the discounts were attributable to prepayments made during the first months of the fiscal year on the previous year's sale contracts, the contract years running from May to May. The total amount of allowances to be claimed on 1937 contracts was, on November 30, 1937, unknown. Respondent's determination to exclude $67,726.24, the total amount of discounts allowed during the fiscal year ended November 30, 1937, in arriving at the gross income from the property represented by the sales contracts of that year, would result in a fictitious "selling amount."

It is disclosed by our findings of fact that of the above named amount of discounts $11,147.47 was applicable to sales included in accrued income for petitioner's taxable year ended November 30, 1936. Also that $19,125.32 of such discounts was attributable to that part of the sales prices of ore representing costs beyond the mine and was excluded therewith from such sales price in determining the gross in-

come from the property for the purpose of percentage depletion. It is apparent, therefore, that the amount of discounts taken in the taxable year 1937 does not represent merely the discounts in respect of sales in that year, nor was it ascertainable at the end of that taxable year what, if any, additional amounts of discounts applicable to sales in that year might be taken in the subsequent taxable year.

* * * The concept of the taxing statutes is violated if items of either gross income or deductions for different years are commingled. *Burnet* v. *Stanford & Brooks Company*, 282 U. S. 359. *Athens Roller Mills, Inc.* v. *Commissioner*, 136 Fed. (2d) 135.

The administration of the tax laws can best be served by the use of a realistic approach to accounting methods where such practice does not violate specific statute or reasonable regulation.

We hold that the "selling amount" of petitioner's ore was not to be reduced by the cash discounts allowed its customers and that, accordingly, respondent erred in reducing petitioner's gross income from the property by deducting $67,726.24 from the sale prices, for the purposes of percentage depletion for its fiscal year ended November 30, 1937.

The final question involves the deductibility of the Wisconsin privilege dividend tax imposed by section 3 of chapter 505 of the Laws of Wisconsin, 1935, as amended. We have held that this tax, along with the others previously discussed, is not to be considered in valuing inventories. Respondent contends that this tax is imposed not upon petitioner but upon its shareholders, and that petitioner merely withheld it upon the distribution of dividends and paid it on behalf of its shareholders. Accordingly, in determining petitioner's tax deficiencies for the fiscal years ended November 30, 1936, and November 30, 1937, he did not deduct the respective amounts of such taxes, to wit, $18,922.68 and $25,209.14.

The Supreme Court, in *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, considered the Wisconsin privilege dividend tax in connection with a constitutional question. In discussing the statute imposing such tax the Court said:

* * * The practical operation of this legislation is to impose an additional tax on corporate earnings within Wisconsin but to postpone the liability for this tax until such earnings are paid out in dividends. In a word, by its general income tax Wisconsin taxes corporate income that is taken in; by the Privilege Dividend Tax of 1935 Wisconsin superimposed upon this income tax a tax on corporate income that is paid out.

Thus, it is apparent that the tax in question was there determined to be a levy on corporate income. Upon the authority of that decision, we hold in petitioner's favor on this issue. The tax is deductible under section 23 (c) of the Revenue Acts of 1934 and 1936.

Reviewed by the Court.

*Decision will be entered under Rule 50.*