OCCIDENTAL PETROLEUM CORPORATION, SUCCESSOR TO ISLAND CREEK COAL COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5147–68, 2013–69.    Filed October 26, 1970.

116

*David B. Buerger* and *William Y. Rodewald*, for the petitioner.
*Louis A. Boxleitner*, for the respondent.

TANNEWALD, *Judge:* Respondent determined deficiencies of $50,-890 and $55,969 in income taxes of petitioner's predecessor for the years 1961 and 1962, respectively. Petitioner disputes these deficiencies and claims that overpayments were made for the years in question.[1] The only issue before us concerns the proper method for allocating certain expenses among various coal mining properties for the purpose of computing the proper amount of percentage depletion allowable for each of those properties. At trial, petitioner acquiesced in respondent's method of allocating certain association dues; hence, that issue is no longer before us.

### FINDINGS OF FACT

Some of the facts are stipulated and are found accordingly.

During the calendar years 1961 and 1962, Island Creek Coal Co. had its principal place of business in Huntington, W. Va. Its returns were timely filed with the district director of internal revenue, Parkersburg, W. Va. The term "petitioner" as used herein refers to Occidental and the presently existing Island Creek Coal Co. and any of their predecessors in interest. See fn. 1 *supra*.

During the years in question, petitioner's activities consisted of the operation of an agreed number of separate coal mining properties and certain nonmining operations. There is no dispute between the parties as to the allocation of expenses between these two types of activities.

Petitioner's primary management goal was to have all mining properties meet a set production schedule. This included operating 230 days per year. In 1961, seven of petitioner's coal mining properties were either closed or idle during part of the year. These mines were Island Creek #7, Island Creek #22, Red Jacket #17, Marianna,

---

[1] The deficiencies and claimed overpayments technically arise out of the tax liabilities of Island Creek Coal Co. Through a series of transactions, that company was, subsequent to the years involved herein, merged into petitioner. The parties agree that petitioner is liable for any deficiencies and is entitled to the benefit of any overpayments found by the Court herein.

Algoma, Elk Creek, and Coal Mountain. Island Creek Mine #7 was closed in 1961, after 43 days of production. The Marianna mine was again closed in February 1962, after 31 days of production. None of petitioner's mining properties was idle for an entire month in 1962 with the exception of the Marianna mine. All of petitioner's mines operated for at least 230 days in 1962 except Kentucky #3 (227 days), Island Creek #28 (213 days), and Island Creek #25 (219 days). The assets of these latter two mines were sold to National Coal Mining Co. on December 1, 1962. Island Creek #25 was only one part of a unit consisting of three mines. The other two mines in this unit, Island Creek #24 and Island Creek #27, operated 243 days and 238 days, respectively, for an average of $233\frac{1}{3}$ days for the unit.

The petitioner was a party to the National Bituminous Coal Wage Agreement of 1950, as amended. By the terms of this agreement, petitioner was required to pay to the "United Mine Workers of America Welfare and Retirement Fund of 1950" 40 cents per ton of coal produced for use or for sale. The purpose of the fund was to provide benefits to members of the union and their families, including medical and hospital care, pensions, accident and disability payments, and wage supplements. Petitioner's payments to the fund were based solely on the number of tons produced at a mine. No payments were made on behalf of a given mine unless that mine produced coal. Payments were also payable irrespective of the means of production (mechanized or otherwise), the type of coal produced, or the quality of the producing seam.

The following are the number of tons sold and the aggregate amount of petitioner's payments to the Fund in the years in question:

| Year | Tons sold | UMW payment |
|------|-----------|-------------|
| 1961 | 11, 348, 915 | $4, 466, 630 |
| 1962 | 12, 189, 166 | 4, 896, 348 |

Of all the union members employed by petitioner, approximately 45 percent worked at the face of the mine. The remaining 55 percent included those who worked outside the mine but whose activities were nevertheless identified with a particular mine and those who worked at idle mines, in central machine shops, and in other activities.

Petitioner's coal mining properties did not all produce the same type or quality of coal. Mines designated as Island Creek #25 and #27, Bartley #1, Algoma, Marianna, Wyoming, and Elk Creek[2] produced only high-quality (metallurgical or domestic) coal. Mines designated as Red Jacket #17, Island Creek #22, #24, and #28,

---

[2] It appears that, during the years at issue, Elk Creek sold only purchased coal and coal produced in prior years. Nevertheless, for purposes of categorization, we have treated Elk Creek as a producing mine.

Bartley #6, Kentucky #3, and Keen Mountain produced high-quality and low-quality (steam) coal but predominantly the former. Mines designated as Guyan #1, #4, #5, and Coal Mountain produced both types but predominantly low-quality coal.[3]

Petitioner's high-quality coal is more expensive to produce than low-quality coal, either because of the natural conditions existing in the mine or because of inherent problems in producing a given type of coal. Petitioner's high-quality coal is more expensive to sell than others because more highly trained salesmen and/or more selling effort is required and the quantities sold are smaller. Petitioner's sales personnel were compensated on a salary plus reimbursed expenses and not on a commission basis. Petitioner's selling expenses for the years in question were as follows: 1961, $1,986,083; 1962, $1,983,216.

Aside from the above UMW payments, selling expenses, and association dues (which are no longer in issue), petitioner had direct expenses during the years in question allocated as follows:

|  | 1961 | 1962 |
|---|---|---|
| Island Creek ##24–25–27 | $10, 866, 638 | $10, 946, 565 |
| Island Creek #7 | 508, 038 | 77, 599 |
| Island Creek #22 | 871, 866 | 1, 690, 670 |
| Island Creek #28 | 2, 662, 675 | 3, 151, 482 |
| Idle operating interests | 161, 188 | 193, 192 |
| Red Jacket #17 | 2, 191, 764 | 3, 136, 339 |
| Bartley ##1 and 6 | 7, 252, 056 | 6, 694, 672 |
| Marianna | 446, 662 | 210, 870 |
| Coal Mountain | 998, 188 | 1, 931, 123 |
| Wyoming | 3, 250, 054 | 2, 141, 648 |
| Algoma | 1, 284, 116 | 2, 397, 219 |
| Guyan #1 | 4, 339, 470 | 4, 767, 962 |
| Guyan #4 | 1, 824, 833 | 2, 513, 303 |
| Guyan #5 | 3, 911, 044 | 4, 538, 132 |
| Elk Creek | 867, 082 | 447, 717 |
| Kentucky #3 | 2, 554, 221 | 2, 693, 927 |
| Keen Mountain | 1, 629, 073 | 1, 703, 784 |
| Total | 45, 618, 968 | 49, 236, 204 |

The tonnage attributable to each mine is revealed by the following table:

|  | 1961 | 1962 |
|---|---|---|
| Island Creek ##24–25–27 | 2, 817 389 | 2, 555, 989 |
| Island Creek #7 | 145, 482 | |
| Island Creek #22 | 194, 218 | 472, 724 |
| Island Creek #28 | 591, 339 | 751, 809 |

[3] We have been unable to categorize the mine designated as Island Creek #7, from which 145,482 tons were sold in 1961. The mine was closed throughout 1962.

| | 1961 | 1962 |
|---|---|---|
| Red Jacket #17 | 544, 497 | 841, 442 |
| Bartley ##1 and 6 | 1, 516, 355 | 1, 343, 683 |
| Marianna | 52, 555 | 13, 004 |
| Coal Mountain | 287, 949 | 712, 831 |
| Wyoming | 513, 248 | 289, 490 |
| Algoma | 249, 172 | 499, 835 |
| Guyan #1 | 1, 475, 018 | 1, 554, 482 |
| Guyan #4 | 627, 447 | 850, 507 |
| Guyan #5 | 1, 327, 346 | 1, 365, 041 |
| Elk Creek | 152, 516 | 36, 511 |
| Kentucky #3 | 468, 842 | 478, 241 |
| Keen Mountain | 385, 542 | 423, 577 |
| Total | 11, 348, 915 | 12, 189, 166 |

During the years in question, petitioner incurred other expenses classified as mine overhead as follows:

| Item | 1961 | 1962 |
|---|---|---|
| Cost of goods sold | $2, 717, 166 | $2, 705, 015 |
| Compensation of officers | 46, 250 | 50, 700 |
| Repairs | 172, 722 | 194, 221 |
| Bad debts | 1, 980 | 5, 975 |
| Depreciation | 4, 867 | 271, 014 |
| General and administrative | 11, 065 | 45, 418 |
| Clerical expense charged others | (253, 662) | (363, 000) |
| Total | 2, 700, 388 | 2, 909, 343 |

The cost of goods sold contained in the above schedule breaks down as follows:

| Cost of goods sold | 1961 | 1962 |
|---|---|---|
| Salaries | $1, 391, 654 | $1, 462, 486 |
| Supplies | 70, 596 | 76, 372 |
| Communications | 75, 719 | 71, 821 |
| Automobile | (28, 516) | (23, 912) |
| Traveling | 19, 213 | 24, 149 |
| Other expense | 101, 355 | 35, 397 |
| Workmen's compensation | 592, 008 | 730, 902 |
| IBM expense | 60, 000 | 60, 000 |
| Bungalow, Holden Inn, and guesthouse | 8, 665 | 8, 269 |
| Water plants and utilities | 1, 358 | 1, 310 |
| Freight | 12, 265 | 10, 962 |
| Insurance | 174, 905 | 155, 970 |
| Legal | 19, 160 | 16, 003 |
| Inventory shortage | 198, 333 | 177, 523 |
| LIFO adjustment | (40, 358) | (211, 921) |
| Slack storage expense | 101, 078 | 137, 128 |
| Abandonments | | 12, 056 |
| Less: Agreed adjustments | [1] (40, 319) | |
| Adjustment | | (39, 500) |
| Total | 2, 717, 166 | 2, 705, 015 |

[1] It appears that there is a mathematical discrepancy in the above table which would be eliminated if this figure were (40,269), and there are indications in the record that this correction is proper.

During the years in question, petitioner incurred general and administrative expense apportionable to its mining activities in the net amounts shown in the following table:

| Item | 1961 | 1962 |
|---|---|---|
| Compensation of officers | $373, 675 | $392, 226 |
| Salaries and wages | 452, 318 | 463, 113 |
| Rents | 150, 182 | 192, 327 |
| Repairs | 676 | 6, 222 |
| Taxes | 45, 812 | 49, 884 |
| Interest | 99, 912 | 0 |
| Pension, group insurance | 411, 978 | 362, 504 |
| Depreciation | 99, 633 | 72, 551 |
| General and administrative | 261, 293 | 290, 763 |
| Other deductions | 16, 113 | 14, 498 |
| | | |
| Total | 1, 911, 592 | 1, 844, 088 |
| Less amounts apportionable to (nonmining activities): | | |
| Other departments: | | |
| West Virginia | (205, 567) | (198, 168) |
| Kentucky | (13, 538) | (9, 388) |
| Virginia | (6, 121) | (6, 408) |
| Oil and gas: | | |
| Old lease | (1, 065) | (900) |
| New lease | (598) | (540) |
| | | |
| Total | (226, 889) | (215, 404) |
| Amount apportionable to mining activities | 1, 684, 703 | 1, 628, 684 |

Efficient mines tended to receive less total attention from petitioner's management and/or require fewer indirect expenses than inefficient mines or mines with reduced production.

To a large degree, the time of petitioner's supervisory personnel, who were not identified with a particular mine, was spent dealing with problem mines, i.e., those which, for example, were not meeting production schedules or which otherwise suffered from curtailed production due to strikes, accidents, etc.

Petitioner's high-quality coal mines had higher direct expense per ton than low-quality coal mines.

The allocation controversy of the instant case has a history dating back at least to petitioner's return for the taxable year 1956, but this is the first time the question has been litigated. Respondent issued statutory notices of deficiencies to petitioner in every year from 1956 through 1962. The notice for the taxable year 1956 was issued on January 13, 1960. In this notice, respondent determined that petitioner's tenement expenses (excess cost of executive housing) and certain of petitioner's general and administrative expenses (but not mine overhead) should be allocated among certain mines in proportion to

the expenses incurred at those mines. Petitioner's timely return had allocated these items on a tonnage basis. Petitioner did not contest respondent's method of allocation when petitioner sought review of the deficiencies in this Court in a petition filed on March 15, 1960. In a stipulation filed on February 2, 1961, the petitioner conceded the correctness of the noncontested adjustments in the statutory notice. (See docket No. 85616.)

The statutory notices of deficiencies for the taxable years 1957 and 1958 were issued on December 16, 1960. These notices were consistent with the 1956 notice in their determination that tenement expenses and certain general and administrative expenses (but not mine overhead) should be allocated among certain mines on an expense basis. Again, petitioner's timely returns had allocated on a tonnage basis. As in the earlier case, petitioner did not contest respondent's determinations on these issues in the petition to this Court which was filed on March 10, 1961, and the stipulation of facts did not refer to these uncontested adjustments.[4] (See docket No. 91431.)

In the statutory notice for the taxable years 1959 and 1960, respondent changed his position and determined that the general and administrative expenses should be apportioned among the mines on a tonnage basis. The notice was dated December 17, 1964.[5] Petitioner's 1959 return had followed this procedure, but the 1960 return had apportioned these expenses in accordance with the method used by respondent for the earlier years. Petitioner contested this change in its petition to this Court, but, in a stipulation filed on May 3, 1966, it was conceded that "general and administrative expenses and mine overhead expense should be allocated to each mineral interest in proportion to the direct expense at each interest." (See docket No. 1286–65.)

ULTIMATE FINDINGS OF FACT

(a) The UMW payments constitute direct expenses, and allocation among the separate mining properties in proportion to tonnage sold constitutes a fair apportionment.

(b) Selling expenses constitute direct expenses, and allocation, in proportion to direct expenses among the three groups of mines in accordance with the quality of coal produced, and allocation to each separate mining property within a given group, in proportion to tonnage sold, constitutes a fair apportionment.

---

[4] It should be noted that all of the notices and petitions for the years 1956 through 1958 were filed prior to the date on which petitioner would have filed its returns for 1961 and 1962.

[5] This would be subsequent to the timely filing of returns for 1961 and 1962. It should be noted that neither in this notice nor on the previous statutory notices did respondent disturb petitioner's allocation of mine overhead on a tonnage basis.

(c) Allocation of indirect expenses (general and administrative and mine overhead) among the separate mining properties in proportion to direct expenses constitutes a fair apportionment.

OPINION

The petitioner is engaged in both coal mining and nonmining activities and the parties are in agreement as to the allocation of expenses between these activities. They are also in agreement that the 50 percent of taxable income limitation contained in section 613(a)[6] must be computed with respect to each of the several distinct coal mining properties operated by petitioner. See sec. 1.613-4(a), Income Tax Regs. Where they part company is in the application of the requirements of respondent's regulation that expenses which are directly attributable to each property shall be charged to that property and that those "not directly attributable to a specific mineral property shall be fairly apportioned among the several properties."

The particular issues which require decision are: (1) Whether payments of 40 cents per ton mined to the United Mine Workers of America Welfare and Retirement Fund (hereinafter referred to as the UMW payments) should be considered a direct expense and charged to each mine on a tonnage basis;[7] (2) whether selling expenses should similarly be considered a direct expense and charged to each mine on a tonnage basis; and (3) whether various other overhead expenses conceded to be indirect expenses (and the UMW payments and the selling expenses to the extent that they are not considered direct expenses) should be allocated among the mining properties on a tonnage basis or in proportion to direct expenses.[8]

Before turning to a consideration of these specific issues, we deem it appropriate to articulate certain broad guidelines which we have used in reaching our decisions:

(1) Section 611(a) provides for a "reasonable allowance for depletion * * *; such reasonable allowance * * * to be made under

---

[6] SEC. 613. PERCENTAGE DEPLETION.

(a) GENERAL RULE.—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion). * * *

[7] Respondent's allocations are on the basis of tonnage sold rather than tonnage produced although the contract with the United Mine Workers provides for such payment on each ton "produced for use or for sale." However, petitioner has made no argument based on this distinction and we will therefore deal with the allocation problem in terms of tonnage sold.

[8] We note at this point that the determination as to whether the UMW payments and the selling expenses are direct or indirect charges becomes material if these items are allocated on a different basis than overhead expenses.

regulations prescribed by the Secretary or his delegate." Concededly, this confers broad discretion on respondent in the exercise of his rule-making power. *Douglas* v. *Commissioner*, 322 U.S. 275 (1944); *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90 (1939). At the same time, it is not without significance that, in the areas with which we are concerned herein, the statute, unlike section 446(b),[9] does not itself prescribe a standard of apportionment nor does it confer discretion upon respondent beyond the authority to promulgate regulations.

In this context, the cases involving respondent's power regarding "accounting methods" are not in point. *Commissioner* v. *Schlude*, 367 U.S. 911 (1961); *American Automobile Assn.* v. *United States*, 367 U.S. 687 (1961); *Commissioner* v. *Hansen*, 360 U.S. 446 (1959); *Lincoln Electric Co.*, 54 T.C. 926 (1970); *Fort Howard Paper Co.*, 49 T.C. 275 (1967); *Photo-Sonics, Inc.*, 42 T.C. 926 (1964), affd. 357 F. 2d 656 (C.A. 9, 1966). Indeed, respondent has advanced no argument that the allocation involved is an "accounting method" within the meaning of section 446. See *North Carolina Granite Corp.*, 43 T.C. 149, 167–168 (1964).

(2) We note that respondent has chosen to exercise his rule-making power in a very limited fashion. He has merely included in his regulations conclusory provisions that expenditures which are "attributable" to a particular property must be deducted and that those which are not "directly attributable * * * shall be fairly apportioned." Sec. 1.613–4(a), Income Tax Regs. He has not undertaken to establish specific criteria of apportionment which would have enlarged the taxpayer's burden to the point of requiring a showing that the regulations were arbitrary. E.g., *Helvering* v. *Wilshire Oil Co., supra.*

(3) While we recognize that the allocation methods here in question fall within the accounting arena, they are not analogous to the usual interperiod accounting problems with which the courts are usually concerned. Thus, changing allocation methods from year to year will not, of itself, result in confusion or improper omissions of items of income. What is done in one year will not necessarily affect what is done in the following year.[10] Indeed, within the requirement that expenses be "fairly apportioned," it may well be that periodical changing of allocation methods may be mandated because of altered condi-

---

[9] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the *opinion* of the Secretary or his delegate, does *clearly reflect income.* [Emphasis added.]

[10] The allocations involved herein are of significance, in respect of the depletion allowance, only to the extent that a larger portion of the expenses in dispute can be charged so as to increase the losses of a particular mine or to vary the amounts of taxable income at various interests in order to take full advantage of the 10 percent of gross income limitation.

tions. Consistency of treatment over the years thus does not weigh heavily in the balance. In this frame of reference, we see no need to belabor, as the parties have done, the respective treatment of the various disputed items by both petitioner and respondent in past years.[11] Similarly, while the practice of other companies may be helpful in determining what constitutes a fair apportionment method, it is not determinative of the standard as applied to a particular taxpayer.

(4) The areas of accounting involved herein, particularly insofar as they apply to allocation of overhead, are replete with uncertainties and ambiguities. This conclusion is confirmed both by the qualifications and reservations which infused the expert testimony which we heard and by our own examination of the writings of various accounting authorities. See, e.g., Klein, "Percentage Depletion—The Role of Proportionate Profits," 41 Taxes 144, 156 (1963).; Schiff, "Distribution Cost Analysis: A Service to Management," 105 J. Acct. 37, 38 (Feb. 1958) ; Miller, "Who Should Pay the President's Salary?," 109 J. Acct. 61–62 (Mar. 1960). See generally, Hills, "The Law of Accounting: II," 54 Col. L. Rev. 1091 (1954) ; Catlett, "Factors That Influence Accounting Principles," 110 J. Acct. 44, 48 (Oct. 1960).

In light of the foregoing, we have concluded that respondent cannot, by proposing a given method in a given year, force the petitioner either to prove that the determination of the deficiency is arbitrary or fail. Respondent's reliance on *Lucas* v. *Structural Steel Co.*, 281 U.S. 264, 266 (1930), and *Montreal Mining Co.*, 2 T.C. 688, 694 (1943), modified on other issues (C.A. 6, 1944, 33 A.F.T.R. 1660, 44–2 U.S.T.C. par. 9490), is misplaced. Both those cases involved valuation of inventories under the predecessor to section 446, which, as we have already pointed out (see pp. 123, *supra*), is not an apt analogy. A showing that the allocation method which it advocates produces a fairer apportionment for its circumstances than the allocation method advocated by respondent is the most which can be required of petitioner in order to satisfy its burden of proof. Cf. *United Salt Corporation*, 40 T.C. 359, 370–373 (1963), affirmed per curiam 339 F. 2d 215 (C.A. 5, 1964).

We now address ourselves to the particular issues in dispute.

### UMW Payments

Petitioner argues that the UMW payments should be apportioned on the basis of either total direct expenses or alternatively on the basis of direct union labor costs.[12] It contends that these payments go into

---

[11] In passing, we note that neither party contends that such past treatment should be accorded the mantle of collateral estoppel.

[12] Respondent complains that this alternative argument was first raised by petitioner on brief and therefore should not be considered. Our examination of the record indicates that respondent had ample notice of this theory of allocation.

a fund which benefits all members of the union and that, since 55 percent of its union labor is not engaged in work at the face of the mine, these payments are part of the "cost of union labor" rather than a cost of producing coal. Petitioner also points out that the historical background of the genesis of the obligation to make such payments indicates that the 40 cents per ton was selected from alternative computation procedures. Based upon the foregoing, petitioner concludes that the tonnage relationship of the charge is merely a method of computing benefits and should therefore not be considered a cost of producing coal. We disagree.

We have already indicated that the allocation of expenses may not technically involve a "method of accounting." But, it does not follow that acceptable accounting concepts are inapplicable. On the contrary, we believe that the allocation procedures employed in the computations necessary under section 613 must at least be defensible within certain broadly defined cost accounting parameters. See Neuner & Frumer, Cost Accounting, Principles and Practice, 3–4, 7–9, 702–703 (7th ed. 1967); Horngren, Cost Accounting, A Managerial Emphasis 3–5, 565 (2d ed. 1967). Respondent's experts (whose qualifications were conceded by petitioner) stated unqualifiedly both on direct examination and cross-examination that, since the UMW payments could be directly identified with a particular segment or "cost center," i.e., a mine, they were direct costs. Their "cost center" view of identifying direct costs is also clearly supported by the accounting authorities. See Accountants' Handbook 6.50. (4th ed., Wixon, 1956); compare Accounting Research Study No. 11, "Financial Reporting in the Extractive Industries," 29–31 (1969). Beyond this, their testimony is consistent with the undisputed facts that the 40-cents-per-ton charge was directly keyed to tons produced, that petitioner accounted for such payments separately for each mine, that no payment was required for any mine which did not produce coal, and that the payment applied uniformly regardless of whether the coal was produced mechanically or by hand or by a combination thereof and regardless of the kind of coal produced, i.e., steam, metallurgical, or other.

Against these weighty indicators, petitioner argues that the raison d'etre for the payments was not the production of the coal but the fact that it employed union labor. It contends that if it had not employed such labor, it would not have had to obligate itself to make the payments. Such an analysis simply will not stand scrutiny. Logically, it would require us to conclude that a per-ton royalty on leased coal land was not a direct cost because the land was the generating force for the payment and if the lease had not been executed, the royalty would not have to be paid. Nor do we think that petitioner's claim that nonproducers (i.e., union labor not employed at the face

of the mine) benefited from the payments and that therefore the payments were in the nature of fringe compensation for all union members has any relevance. Many union members who did not work at the face of the mine were nevertheless engaged in activities identified with particular mines, e.g., loading and tipple production.

The considerations advanced by petitioner do not counteract the hard fact that it is the production of the coal from the particular mine which generated the 40-cents-per-ton payment. The role of the labor element in producing coal is at best imprecise in view of the fact that the payments were not geared to the means of production, the type of coal produced, or the quality of the producing seam, all of which elements would appear to have a direct bearing on the cost of labor. Thus, an allocation on the basis of the cost of direct union labor would be inappropriate. The same is true, only more so, with respect to petitioner's claim that the UMW payments should be allocated on the basis of total direct expenses, which included such items as repairs, interest, taxes, and depreciation. Variations in the amounts of these items in any given year would obviously not be correlated with the amounts of the UMW payments.

Petitioner seeks to take a clearly identifiable element of cost that varies exactly in direct proportion to tonnage and treat it as an indirect cost to be allocated among the mining properties by an admittedly imprecise method of allocation. This it may not do. We hold that the UMW payments constitute direct costs chargeable to each separate mining property on a tonnage basis.

### Selling Expenses

That the cost of selling coal can be directly identified with the process of producing and disposing of the output of each mine cannot be denied. The same reasoning which caused us to conclude that the UMW payments should be treated as a direct, rather than an indirect, expense supports the conclusion that selling expenses should be similarly treated. The testimony of the expert witnesses buttresses that conclusion. In point of fact, petitioner does not seriously argue that selling expenses should not be so treated. Rather, petitioner correctly argues that the real issue is how those expenses should be allocated to each mining property.

Petitioner's sales personnel were compensated on a salary plus reimbursed expenses and not on a commission basis. Their duties extended beyond mere selling and involved technical advice and assistance to customers which were important in connection with purchases of high-quality coal. Consequently, more time and effort

were devoted to selling high-quality (metallurgical and domestic) coal than low-quality (steam) coal. The evidence also indicates that if a mine was closed or production reduced total selling expenses were not decreased and that the dollar amount of such expenses remained approximately the same during a period when the number of tons sold approximately doubled. Finally, it appears that the high-quality coal is more costly to produce than low-quality coal. Based upon the foregoing, petitioner argues that allocation of selling expenses on a tonnage basis (in accordance with respondent's contention), would produce a distortion of the taxable income from each mining property and that an allocation in proportion to the direct expenses of each property constitutes a fair method of apportionment. We agree with petitioner in part.

The evidence shows that petitioner's mines can be conveniently grouped into three categories based upon the type of coal produced: (1) Mines which produced only the more expensive type of coal,[13] (2) mines which produced both the more expensive and less expensive types but predominantly the former type,[14] (3) mines which produced both types but predominantly the less expensive type.[15] However, no persuasive evidence was presented to show that, within a given group, there were significant variations in selling expenses. Nor is there any persuasive evidence which would permit us to make a judgment as to the extent of variations of selling time and effort among mines within a given group. Therefore, while we cannot accept respondent's implicit contention that all tons of coal cost the same to sell, neither do we feel that petitioner has produced sufficient evidence to show a correlation between the direct expenses incurred at a given mine within one of the three groups delineated above and the selling expenses attributable to that mine. In the absence of any such correlation and in light of the fact that direct expenses include such items as taxes, depreciation, and repairs, which obviously do not vary with selling expenses, an allocation in proportion to direct expenses within a group is unacceptable. Accordingly, on the basis of the record herein, we conclude that, as among the foregoing three groups, the total selling expenses should be first allocated on an aggregate direct expense basis for that group and, within each group, the allocation should be on a tonnage basis.[16]

---

[13] This group includes: Island Creek #25 and #27, Bartley #1, Algoma, Marianna, Wyoming, and Elk Creek.

[14] This group includes: Red Jacket #17, Island Creek #22, #24, and #28, Bartley #6, Kentucky #3, and Keen Mountain.

[15] This group includes: Guyan #1, #4, and #5 and Coal Mountain.

[16] Since we have been unable to identify Island Creek #7 (see fn. 3, *supra*), a portion of total selling expenses should first be allocated to that mine on a tonnage basis.

## Indirect Expenses

The most difficult issue herein involves the allocation of indirect expenses,[17] which, as our findings of fact show, encompass a myriad of items. Respondent adopts a simplistic approach and argues that allocation on a tonnage basis constitutes a fair apportionment. Petitioner counters with the assertion that such an allocation is arbitrary and, in any event, unfair and, adopting an equally simplistic approach, argues that allocation in proportion to direct expenses satisfies the requirement of respondent's regulation. The source of our difficulty stems from the fact that, as our subsequent discussion will show, there are defects in adopting a uniform allocation formula for *all* indirect expenses.

At the outset, we will dispose of petitioner's contention that respondent's method of allocation on a tonnage basis is so erroneous as to warrant a holding that it is arbitrary and capricious, with the result that the burden of proof shifts to the respondent under the doctrine of *Helvering* v. *Taylor*, 293 U.S. 507 (1935). Concededly, respondent's method is less than mathematically accurate and, indeed, we have concluded that, on the basis of the facts of this case, it is not the measure of fair apportionment. But based upon the record herein (particularly the testimony of the experts) and the uncertainties revealed by the accounting authorities, we cannot say that it is overwhelmingly clear that respondent's method should be rejected. See citations at p. 124 *supra;* compare Anderson, Arthur & Co., Oil and Gas Federal Income Tax Manual 183–186 (1966); Howell, "Allocating Overhead When Computing Percentage Depletion," P-H. Oil & Gas Taxes, par. 2013 *et seq.*; Miller, Oil and Gas Federal Income Taxation 130–134 (1970); Miller, "Allocation of Overhead for Percentage Depletion Computation," 3 Oil & Gas Tax Quarterly 127 *et seq.* (1954). We hold that, although respondent's method has "quick and dirty" aspects (the description is petitioner's), it is not arbitrary and capricious.[18]

Preliminarily, we also note that the content of the items constituting direct expenses has a bearing on the impact of an allocation based on direct expenses and therefore on whether the fair apportionment standard has been met. As our opinion already indicates,

---

[17] This description is used for convenience to describe the general and administrative and mine overhead expenses set forth in our Findings of Fact.

[18] In view of this conclusion, we need not decide the extent to which the doctrine of *Helvering* v. *Taylor*, 293 U.S. 507 (1935), applies to the situation, such as involved herein, where the petitioner seeks to change its method of allocation from the tonnage basis which was used in its tax returns and which was accepted by respondent, i.e., with respect to all indirect expenses for 1961 and mine overhead for 1962.

the parties have had substantial differences as to what should be included in direct expenses. In presenting its position that indirect expenses should be allocated on the basis of direct expenses, petitioner did not include the UMW payments or selling expenses in the latter category, presumably because the use of a direct expense formula for these two items and for indirect expenses produced the same result. Petitioner has made no separate argument that these two items should not be considered as direct expenses for purposes of an allocation in proportion to such expenses. Since we have determined that the UMW payments and selling expenses should be treated as direct expenses, we conclude that they should be so treated in determining the allocation of indirect expenses.

We have already pointed out that both parties have presented their argument on the allocation of indirect expenses in absolute terms. Testimony of the experts indicates making an across-the-board choice of an allocation method is less than satisfactory. Nevertheless, we have decided to accept the frame of reference established by the parties. After careful evaluation of the entire record herein, we have concluded that, under the circumstances of this particular case, petitioner has carried its burden of proof that indirect expenses should be allocated among the separate mining properties in proportion to the direct expenses attributable to each of those properties and we so hold. In arriving at this conclusion, we delineate the principal considerations which we have taken into account. We list them without any indication of their order of importance.

(1) It generally appears that, in the mining industry, efficient mines tend to receive less total attention from management and/or require fewer indirect expenditures than inefficient mines or mines with reduced production. Cf. Miller, "Who Should Pay the President's Salary?," 109 J. Acct. 61, 61–62 (Mar. 1960).

(2) We are satisfied that to a large degree the time of petitioner's supervisory personnel, who were not directly identified with a particular mine, was spent in dealing with problem mines, i.e., those which, for example, were not meeting production schedules or which otherwise suffered from curtailed production due to strikes, accidents, etc. This is a significant consideration, since the compensation of such personnel represents a substantial part of indirect expenses. While the record herein is not as precise as we would have liked, we are satisfied that these problem mines incurred proportionately higher direct expenses. This conclusion finds support in our analysis of the underlying figures for 1961 and 1962, which indicates that, although tonnage and direct expense usually varied in the same direction, the proportional differences were, in many instances, significant. Direct expenses usu-

ally dropped more slowly than tonnage and increased less slowly than tonnage.[19]

(3) Allocation on the basis of tonnage has definite shortcomings. Such an allocation, in light of the elements described in (1) above, would mean that (a) efficient mines with high production would receive a disproportionately large share of expenses; (b) problem mines with declining production would not receive a fair share of expenses; and (c) inefficient mines with rising production would not receive a sufficient allocation of expenses.

(4) The existence and applicability of an industry practice is far from clear. Respondent presented the testimony of officials of four other companies to the effect that the practice of those companies was to allocate indirect expenses on the basis of tonnage. The testimony indicated that two operated only captive mines (Jones & Laughlin and Duquesne Light), two operated only a few mines (Duquesne Light and Carbon Fuel Co.), and two had no idle mines (Jones & Laughlin and Carbon Fuel Co.). No testimony was given as to the operating conditions of one of the companies (Consolidated Coal). We did not find this testimony particularly helpful in view of the obvious disparity between the situations of each of those companies as compared with that of petitioner. Certainly the testimony of these officials fell far short of indicating any industry practice.

We have, however, taken into account the fact that what little accounting lore exists indicates that allocation of indirect expenses in proportion to direct expenses is the preferred overall method. See Howell, "Allocating Overhead When Computing Percentage Depletion," P-H. Oil & Gas Taxes, par. 2013 *et seq.;* Miller, "Allocation of Overhead for Percentage Depletion Computation," 3 Oil & Gas Tax Quarterly 132 (1954). In so stating, we are not unmindful that these accounting articulations deal principally with allocation of indirect expenses in the oil and gas area. Since there may well be some differences between oil and gas and coal mining, we have accorded limited weight to these authorities. Morever, we are not unmindful of the fact that the concept of fair apportionment should be determined in relation to the individual taxpayer rather than to the general practice of the industry. See p. 124 *supra.*

(6) The testimony of respondent's experts clearly established that allocation of indirect expenses under any across-the-board formula was not wholly satisfactory. Both experts indicated that they preferred an allocation method which would segregate such expenses into

---

[19] We recognize that a decline in production accompanied by a smaller decline in expenses or a rise in production accompanied by a larger rise in expenses does not necessarily indicate that a production problem exists, as such variations could be due to foreseeable natural conditions.

homogeneous pools, i.e., grouping of items which could be keyed to separate, rational bases for allocation. Thus, for example, they suggested that compensation of indirect supervisory personnel should be determined on the basis of an analysis of time actually spent with respect to each separate mining property,[20] that depreciation and interest on indebtedness should be allocated on the basis of the investment in each property, and that workmen's compensation and mine safety expenses should be allocated on the basis of accident records and time actually spent in connection therewith. In so doing, they cast doubt on both of the methods urged upon us herein. To be sure, both testified that, absent any facts, respondent's tonnage formula was the preferred "quick and dirty" method. But both also testified that, to the extent that the efforts of indirect supervisory personnel were spent in proportion to direct expenses, petitioner's formula was fair. In light of our findings and previous discussion, we do not think that the testimony of these experts requires us to conclude that petitioner's position should be rejected.

(7) Petitioner has cited a few judicial authorities which purportedly bear on the subject of allocation of indirect expenses. *Whitehall Cement Manufacturing Co.* v. *United States*, 369 F. 2d 468 (C.A. 3, 1966) ; *Standard Lime & Cement Co.* v. *United States*, 329 F. 2d 939 (Ct. Cl. 1964) ; *Southwestern Portland Cement Co.* v. *United States*, an unreported case (C.D. Cal. 1968, 1969–1 U.S.T.C. par. 9110, 22 A.F.T.R. 2d 5874) ; G.C.M. 22956, 1941–2 C.B. 103.[21] Compare also *United Salt Corporation, supra; Tennessee Consolidated Coal Co.*, 15 T.C. (1950). But the issues in the foregoing dealt with the allocation of indirect expenses between mining and nonmining activities,[22] where obviously the use of a tonnage measurement was mathematically impossible.[23] In *Standard Lime*, the reported opinion simply notes that the issue of allocation among separate mining properties on the basis of direct expenses, which had been disputed before the Court of Claims commissioner, was conceded by the Government before the court. We consider this concession, made in the context of a litigated case involving other issues and in light of a proposed decision on these issues, of no significance.

---

[20] They also suggested a similar analysis as the underpinning for an allocation of selling expenses as a direct cost.

[21] This ruling was declared obsolete after the taxable years involved herein. See Rev. Rul. 68–661, 1968–2 C.B. 607, 608.

[22] G.C.M. 22956 dealt in passing with the issues involved herein simply in the language of the statute specifying that the part of overhead "allocable to depletable properties must then be fairly apportioned to the several specific properties." See 1941–2 C.B. 105.

[23] The mathematical difficulties involved deprive respondent's agreement herein to allocate indirect expenses between operating and idle mines on the basis of direct expenses of any significance.

(8) Petitioner also points to the prior history of the dispute between it and respondent with respect to the allocation of indirect expenses as set forth in our Findings of Fact. While it appears that petitioner did not adopt with alacrity or to the full extent respondent's position on such allocation in prior years, the fact is that petitioner's position herein does correspond with what respondent had previously thought constituted a fair apportionment and sought to impose (successfully, in the sense of acceptance by petitioner) as a change from the tonnage allocation method previously used. Clearly, this pattern does not amount to estoppel as against respondent,[24] but in a complicated area such as this where there is merit to petitioner's position, we think the fact that respondent seeks to switch horses has some bearing on our analysis, albeit small since, in situations such as this, each year may have its own circumstances. Compare *Geometric Stamping Co.*, 26 T.C. 301, 305 (1956) ; *Gus Blass Co.*, 9 T.C. 15, 35 (1947). The same can be said of the fact that respondent, in the instant case, has accepted petitioner's allocation of the excess cost of executive housing (tenements) on the basis of direct expenses. The difference between this cost and other indirect expenses involving executives' salaries is hard to perceive. Just as we have accorded minor consideration to respondent's prior position, we consider the fact that petitioner utilized the tonnage method of allocation for many years has limited significance.

(9) In opting for petitioner's position, we do not mean to imply that it is not without its own inherent difficulties. As the expert testimony indicates (see pp. 130-131 *supra*), there are several items of indirect expense which do not fit the direct expense allocation mold. To the examples revealed by that testimony, we can add corporate transfer agent expenses and bad debts. In this connection, we note that the imperfections of using the direct expense method of allocation herein are counterbalanced to a substantial extent by our holdings that the UMW payments and selling expenses are direct expenses and that all of the former and portions of the latter should first be allocated on a tonnage basis.

The temptation has been great to lay down general rules in the area of dispute involved herein, especially since there are no existing judicial guides. But we have resisted this temptation and have concluded that our function was confined to finding the proper method of allocation of indirect expenses for this petitioner in these years on the facts revealed by this record and within the frame of reference established by the parties. It has been said that, "It is not the province of the court to weigh and determine the relative merits of systems of accounting." See *Brown* v. *Helvering*, 291 U.S. 193, 204-205 (1934).

---

[24] See fn. 11 *supra*.

Perhaps this admonition is less applicable to this Court, which is often called upon to apply its special expertise, but it cannot be gainsaid that even we are severely handicapped in pursuing our path to decision where, as is the case herein, the experts in the private sector give guarded opinions and the respondent has failed to spell out any useful guidance in accordance with the broad, discretionary authority conferred upon him by Congress. In many ways, it is more difficult for the courts to make the Solomon-like judgment required herein than in the area of valuation of property. See *Morris M. Messing*, 48 T.C. 502, 512 (1967). It appears to us that it would not be too burdensome a task for respondent to develop, preferably in cooperation with the industry, general guidelines which could be applied unless the taxpayer showed circumstances justifying an exception.[25] We recognize, of course, that the degree of complication will vary inversely with the number of homogeneous pools involved in any breakdown.[26] But the magnitude of the task is not an excuse for not undertaking it.

*Decisions will be entered under Rule 50.*

---

[25] Respondent's proposed new regulations, which merely change the phrase "fairly apportioned" to "properly apportioned" can hardly be said to represent progress in this direction. 33 Fed. Reg. 10707 (1968).

[26] In addition to such a breakdown, different allocation measurements would have to be developed. Some of these potential measurements were suggested by the experts who testified herein and are also revealed in the various accounting authorities. To a degree, such development might also extend to direct expenses—for example, allocating selling expenses on a dollar-value tonnage basis.